METROPOLITAN COUNCIL NO 23, AFSCME v OAKLAND
COUNTY PROSECUTOR

Docket No. 63127. Argued January 10, 1980 (Calendar No. 15).—
Decided July 16, 1980.

Seventeen investigating officers employed by the Oakland County
Prosecutor's office, who were represented by Metropolitan
Council No. 23, American Federation of State, County & Mu-
nicipal Employees, AFL-CIO, reached an impasse in negotia-
tions to establish a collective bargaining agreement with their
employer. The union petitioned the Employment Relations
Commission for compulsory arbitration of the contract under
the statute concerning contract-formation disputes in police
and fire departments. The Employment Relations Commission
granted the petition, finding that the prosecutor's investigators
were "subject to the hazards" of police officers within the
meaning of the compulsory arbitration statute, and that it
therefore applied. The Court of Appeals, Danhof, C.J., and
Bronson and Beasley, JJ., affirmed (Docket No. 78-1196). Defen-
dant appeals. In opinions by Justices Williams, Ryan, and
Moody, Justice Levin dissenting, the Supreme Court held that
the dispute in this case is not subject to the compulsory
arbitration statute.

Justice Williams, joined by Chief Justice Coleman and Jus-
tice Fitzgerald wrote:

1. Each part of a statute must be considered with every other
part. The meaning of any part of the statute should be con-
strued, if possible, to produce a harmonious and consistent
enactment as a whole. The particular effect of any part gener-
ally must be found from the context of the act, the nature of its
subject, and the legislative purpose. The purpose of interpreting

REFERENCES FOR POINTS IN HEADNOTES

[1-3, 9, 11-13] 73 Am Jur 2d, Statutes §§ 145, 158.
[2, 11-13] 73 Am Jur 2d, Statutes § 154.
[3, 11-13] 73 Am Jur 2d, Statutes §§ 207, 208.
[4-13] 48 Am Jur 2d, Labor and Labor Relations (Rev) §§ 1772, 1773.
Validity and construction of statutes or ordinances providing for
arbitration of labor disputes involving public employees. 68
ALR3d 885.

a statute is to give effect to the legislative intent. If there is a conflict, the spirit and purpose of the statute should prevail over its strict letter. Therefore, departure from the literal construction of a statute is justified where such a construction would produce an absurd and unjust result, and would be clearly inconsistent with the purposes and policies of the act in question.

2. The legislative purpose of the statute in this case was to provide a binding procedure for resolving contract-formation disputes and to avert strikes in police and fire departments which would be likely to cause an imminent, serious threat to the public order, safety, and welfare and undermine the high morale and efficient operation of the departments. The argument that the Legislature intended the dispute of the prosecutor's investigators to be resolved under the statute is not persuasive. Although they are found to be subject to the hazards of police work and are engaged in that capacity by a county department, submission of their dispute to binding arbitration would not effectuate the general legislative intent to avert stoppages of critical public services. To permit the investigators' dispute to be submitted under the statute, by applying one provision of it literally, would be neither consonant with the express legislative intent nor sound reason. The dispute in this case does not constitute an impasse in collective bargaining where the public welfare cannot endure a stoppage of work until negotiation resolves the dispute.

3. The parties, the Employment Relations Commission and the Court of Appeals have considered only the situation of the complaining employees, regardless of the principal function of the public employer. The factual finding that these investigators are subject to the hazards of police work is supported by competent, material and substantial evidence on the whole record. However, to terminate the inquiry there is to ignore the act as a whole. These investigators, as public employees, are prohibited from striking by the public employment relations act and may resort to its provisions for resolving labor disputes. Even if they were to engage in an illegal strike, that would not invade the public order, safety, and welfare and endanger the community in the manner contemplated by the compulsory arbitration statute. The practical duties of the prosecutor's office, unlike those of emergency medical services which are now included within the statute, are not as valuable to the public as that provided by police or fire departments, and a disruptive labor dispute among these employees would not be detrimental to the public welfare as would a strike by police

officers or fire fighters. The Oakland County Prosecutor's office does not constitute a "public police department" within the paramount legislative intent expressed in the statute and in case law.

Justice Ryan, joined by Chief Justice Coleman, concurred in the result because the prosecutor's investigators are not "employees engaged as policemen" whose strike would be likely to cause an imminent and serious threat to public safety and were not intended by the Legislature to be included within the provisions of the statute.

Justice Moody concurred in the result. While the investigators in this case may function in some ways as "policemen", the Legislature did not intend that they should be included under the mantle of the compulsory arbitration statute. He offered no opinion whether a person who functions as a "policeman" but is not a member of a "police department" may be or was intended to be included among those protected by the statute. There may be persons clearly intended to be protected who would not be afforded protection if the statute were given too strict or literal an interpretation.

Reversed.

Justice Levin, joined by Justice Kavanagh, dissenting, would not introduce a requirement that the employees and the employer both have "critical-service status". While the statute aims to provide a means of averting critical-service work stoppages by police officers and fire fighters, the act by its terms covers persons "subject to the hazards" of police work and fire fighting without inquiry whether a work stoppage by those persons would threaten community safety.

1. It is unnecessary to the disposition of this case to consider what might be the proper resolution of a case in which it was claimed that because some of a county or city department's employees were subject to the hazards of police work, *all* employees were subject to compulsory arbitration irrespective of whether their positions exposed them to those hazards. The question in this case is not whether employees who are neither policemen nor subject to the hazards of police work come within the act, but whether employees who are subject to the hazards of police work, although neither titled "policemen" nor employed by an agency called a police department, are subject to its provisions.

2. One can agree that the primary motivation for the passage of the compulsory arbitration act was to forestall police and fire fighter work stoppages which might threaten community safety without conceding that the Legislature intended to limit the

act's reach to cases where both the complaining employee and the interested employer enjoy "critical-service" status. The Legislature has not used the word "critical" or any similar term in identifying the departments or employees within the scope of the statute or in any other provision of the statute. For whatever reasons, it elected not to define the class of disputes covered by the statute in terms of the urgency of the services at stake or the potential threat that their interruption would pose to the community. It is not manifestly absurd or incredible to suppose that the Legislature intended employees in the position of these investigating officers to come within the scope of the act. Indeed, the inclusion of the words "or subject to the hazards thereof" indicates that the Legislature did not intend to confine the act's coverage to police officers or fire fighters.

3. There is no indication in the act that the Legislature considered some police officers more important than others or regarded some departments as more indispensable than others. But the proposed "critical-service" analysis suggests that among the ranks of an ordinary police or fire department, some officers (e.g., those in charge of files, fingerprints and storage of evidence) might not meet the definition for arbitration along with their fellow officers, and moreover leads either to the conclusion that the officers from municipal police departments who worked side-by-side with Oakland County Prosecutor's investigators on such assignments as gambling raids, narcotics surveillance and "buys", and the special child homicide task force, are not within the intendment of the act, or to the conclusion that those officers are subject to arbitration while the investigators are not solely because of departmental affiliation, although the act draws no distinctions between "public police and fire departments" meeting the statutory definition. Before adopting such a construction, the Court should, at minimum, remand the cause to the Employment Relations Commission whose perspective for gauging the effect of such a construction upon the operation of the act is superior to the Court's. The impasse in bargaining in this case should be resolved by arbitration.

89 Mich App 564; 280 NW2d 600 (1979) reversed.

OPINION BY WILLIAMS, J.

1. STATUTES — CONSTRUCTION — LEGISLATIVE INTENT.

 *A statute generally must be construed as a whole, and the particular effect of any part must be found from the context of the act, the nature of its subject, and the legislative purpose;*

*the intention of the Legislature must prevail over any rule of statutory construction to the contrary.*

2. STATUTES — CONSTRUCTION — LEGISLATIVE INTENT.

*The purpose in interpreting a statute is to give effect to the legislative intent; if there is a conflict, the spirit and purpose of the statute should prevail over its strict letter.*

3. STATUTES — CONSTRUCTION — LEGISLATIVE INTENT.

*Departure from the literal construction of a statute is justified where such a construction would produce an absurd and unjust result, and would be clearly inconsistent with the purposes and policies of the act in question.*

4. LABOR RELATIONS — COMPULSORY ARBITRATION — POLICE AND FIRE DEPARTMENTS — MUNICIPAL CORPORATIONS — LEGISLATIVE PURPOSE.

*The legislative purpose of the statute which provides for compulsory arbitration of disputes concerning contract formation in police and fire departments was to provide a binding procedure for resolving disputes to avert strikes which would be likely to cause an imminent, serious threat to the public order, safety, and welfare and undermine the high morale and efficient operation of the police and fire departments (MCL 423.231 et seq.; MSA 17.455[31] et seq.).*

5. LABOR RELATIONS — COMPULSORY ARBITRATION — POLICE AND FIRE DEPARTMENTS — PROSECUTING ATTORNEYS — INVESTIGATING OFFICERS.

*Submission of a dispute concerning labor contract formation for investigating officers employed by a prosecuting attorney to binding arbitration under the statute concerning such disputes in police and fire departments would be neither consonant with the express legislative intent of the statute, nor sound reason; a dispute between a prosecutor and his investigating officers does not constitute an impasse in collective bargaining such that the public welfare cannot endure a stoppage of work until negotiation resolves the dispute (MCL 49.31, 423.231 et seq.; MSA 5.791, 17.455[31] et seq.).*

6. LABOR RELATIONS — COMPULSORY ARBITRATION — POLICE AND FIRE DEPARTMENTS — PROSECUTING ATTORNEYS — INVESTIGATING OFFICERS.

*The conclusion that the statute which provides for compulsory arbitration of disputes concerning contract formation in police and fire departments applies to investigating officers employed by a prosecuting attorney after considering only the situation*

*of the complaining employees is error; a factual finding that the employees are "subject to the hazards" of police work does not end the inquiry without consideration of the principal function of the public employer (MCL 49.31, 423.231 et seq.; MSA 5.791, 17.455[31] et seq.).*

7. LABOR RELATIONS — COMPULSORY ARBITRATION — POLICE AND FIRE DEPARTMENTS — PROSECUTING ATTORNEYS — WORDS AND PHRASES.

*A prosecuting attorney's office does not constitute a "public police * * * department" within the legislative intent of the statute providing for compulsory arbitration of disputes concerning contract formation in police and fire departments (MCL 49.31, 423.231 et seq.; MSA 5.791, 17.455[31] et seq.).*

OPINION CONCURRING IN RESULT BY RYAN, J.

8. LABOR RELATIONS — COMPULSORY ARBITRATION — POLICE AND FIRE DEPARTMENTS — PROSECUTING ATTORNEYS — INVESTIGATORS — WORDS AND PHRASES.

*Investigators employed in a prosecuting attorney's department are not "employees engaged as policemen" whose strike would be likely to cause an imminent and serious threat to public safety and were not intended by the Legislature to be included within the provisions of the statute which provides for compulsory arbitration of disputes concerning contract formation in police and fire departments (MCL 423.231 et seq.; MSA 17.455[31] et seq.).*

OPINION CONCURRING IN RESULT BY BLAIR MOODY, JR., J.

9. LABOR RELATIONS — COMPULSORY ARBITRATION — STATUTES — CONSTRUCTION — PROSECUTING ATTORNEYS — INVESTIGATORS.

*The Legislature did not intend that investigating officers employed in a prosecuting attorney's department should be included under the statute which provides for compulsory arbitration of disputes concerning contract formation in police and fire departments, although the investigators may function in some ways as "policemen" (MCL 49.31, 423.231 et seq.; MSA 5.791, 17.455[31] et seq.).*

DISSENTING OPINION BY LEVIN, J.

10. LABOR RELATIONS — COMPULSORY ARBITRATION — STATUTES — CONSTRUCTION — CRITICAL SERVICE.

*The statute providing for compulsory arbitration of contract-formation labor disputes in police and fire departments by its terms covers persons "subject to the hazards" of police work*

and fire fighting without inquiry whether a work stoppage by those persons would threaten community safety, and has no requirement that the employees and employer both have "critical-service" status (MCL 423.231 et seq.; MSA 17.455[31] et seq.).

11. LABOR RELATIONS — COMPULSORY ARBITRATION — STATUTES — CONSTRUCTION.

The language of the statute providing for compulsory arbitration of contract-formation labor disputes in police and fire departments is not entirely free of ambiguity, but in a case where the question is whether employees who are subject to the hazards of police work, although neither titled "policemen" nor employed by an agency called a police department, are subject to its provisions, it is unnecessary to decision to consider what might be the proper resolution of a case in which it was claimed that, because some of a county or city department's employees were subject to the hazards of police work, all employees were subject to arbitration irrespective of whether their work exposed them to those hazards (MCL 423.231 et seq.; MSA 17.455[31] et seq.).

12. LABOR RELATIONS — COMPULSORY ARBITRATION — STATUTES — CONSTRUCTION.

The Legislature has not used the word "critical" or any similar term in identifying the departments or employees within the scope of the statute providing for compulsory arbitration of contract-formation labor disputes in police and fire departments, and while the primary motivation for the statute may have been to forestall police and fire fighter work stoppages which might threaten community safety, there is no indication that the Legislature intended to limit its reach to cases where both the complaining employee and the interested employer enjoy critical-service status (MCL 423.231 et seq.; MSA 17.455[31] et seq.).

13. LABOR RELATIONS — COMPULSORY ARBITRATION — PROSECUTING ATTORNEYS — INVESTIGATORS.

It is not manifestly absurd or incredible to suppose that the Legislature intended employees in the position of prosecutor's investigators, who were found by the Employment Relations Commission to be "subject to the hazards" of police work within the meaning of the statute providing for compulsory arbitration of contract-formation labor disputes in police and fire departments, to come within the scope of the statute, and to permit the investigators or the county to initiate arbitration

*proceedings to resolve their collective bargaining impasse would not defeat the statute's purpose or intent, or be inconsistent with its spirit (MCL 423.231 et seq.; MSA 17.455[31] et seq.).*

*Zwerdling & Maurer* (by *M. Elizabeth Bunn* and *George M. Maurer, Jr.)* for plaintiff.

*A. Russell Messina,* Assistant Civil Counsel, for defendant.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *George M. Bourgon, Jon M. De Horn,* and *Dennis J. Grifka,* Assistants Attorney General, for Employment Relations Commission.

Amici Curiae:

*Roy W. Rogensues* for City of Center Line.

*George G. Matish,* Acting Corporation Counsel, *Michael A. Hurvitz,* Assistant Corporation Counsel, and *William M. Saxton* and *Bernard J. Fieger,* Special Assistants Corporation Counsel, for the City of Detroit.

*Lippitt, Harrison, Perlove, Friedman & Zack* (by *Bernard A. Friedman* and *Bernard Feldman)* for the Detroit Police Lieutenants and Sergeants Association.

*Gregory, Van Lopik, Korney & Moore* for the Detroit Police Officers Association.

*Hiller, Howard, Larky & Hoekenga* (by *Daniel J. Hoekenga* and *Marc M. Susselman)* for the Police Officers Association of Michigan.

*John A. Lyons* for the Michigan State Lodge and State Labor Council, Fraternal Order of Police.

WILLIAMS, J. *(for reversal).* This is a case of first impression in this Court. Generally, it involves whether 17 prosecutor's investigators employed in the Oakland County Prosecutor's Department and represented by a separate collective bargaining unit therein may initiate compulsory, binding "public police and fire department" interest arbitration proceedings pursuant to 1969 PA 312. MCL 423.231 *et seq.;* MSA 17.455(31) *et seq.* (act or Act 312).

The Legislature, seeking to avoid the peril to public safety, order and welfare caused by "public police and fire department" critical-service work stoppages, enacted Act 312. The express purposes, objects, and mechanics of the act are codified in §§ 1, 2(1) and 3 respectively:

"Sec. 1. It is the public policy of this state that *in public police and fire departments,* where the right of employees to strike is by law prohibited, *it is requisite to the high morale of such employees and the efficient operation of such departments* to afford an alternate, expeditious, effective and binding procedure for the resolution of disputes, * * *." MCL 423.231; MSA 17.455(31). (Emphasis supplied.)

"Sec. 2. (1) *Public police and fire departments means any department of a* city, *county,* village, or township *having employees engaged as policemen,* or in fire fighting *or subject to the hazards thereof,* emergency medical service personnel employed by a police or fire department, or an emergency telephone operator employed by a police or fire department." MCL 423.232(1); MSA 17.455(32)(1). (Emphasis supplied.)

"Sec. 3. Whenever in the course of mediation of a *public police or fire department employee's dispute* * * * [an impasse is reached], *the employees or employer may initiate binding arbitration proceedings*

* * *." MCL 423.233; MSA 17.455(33). (Emphasis supplied.)

In essence, pursuant to § 3 either "the employees or employer" of a § 2(1) public police or fire "department * * * having employees engaged as policemen, * * * or subject to the hazards thereof", may initiate binding interest arbitration proceedings to resolve a "public police or fire department employee's dispute" where, as stated in § 1, "it is requisite to the high morale of such employees and the efficient operation of such departments" for averting critical-service work stoppages.

While the act as a whole was obviously engineered to avert critical-service work stoppages arising from the nonresolution of a "public police * * * department employee's dispute", the act is inherently ambiguous regarding eligibility to invoke its intended coverage. Although §§ 1, 2(1) and 3 each refer to a "public police or fire department" as the object of the act's dispute resolution coverage, this object admits of three differing interpretations. These interpretations depend on whether one concentrates on (1) the literal status of the interested municipal department/employer, (2) the critical-service status of the complaining employee, or (3) the critical-service status of both guided by the legislative intent underlying the act as a whole.

The first interpretation concentrates sole attention on the *status of the interested department/ employer* and emerges from a literal reading of § 2(1) alone. As such, regardless of the critical-service employment status of the particular complainant employee, if the interested department/ employer is a literal § 2(1) county department having somewhere within its ranks more than one employee engaged subject to the hazards of police

work, both itself and *all* of its employees may invoke the act as a statutorily-defined "public police department" employer or employee. The sole requisite for invocation of the act under this interpretation is a finding that the interested department of municipal government—whatever its principal function or charter, be it a city administrative department, a county library, or a township sanitation department—engage more than one employee in either police work or in a capacity subject to the hazards thereof. Literal satisfaction of the § 2(1) scope provision alone is thought sufficient to activate the entire Act 312 statutory scheme in favor of all departmental employees' disputes; further, no reference is made to whether operation of the act in favor of this interested department/employer as well as each of its employees would effectuate the act's manifest intent to avert critical-service work stoppages. This interpretation has been argued and rejected in dicta by at least two Court of Appeals panels.[1]

---

[1] In *Lincoln Park Detention Officers v Lincoln Park,* 76 Mich App 358; 256 NW2d 593 (1977), a voluntary association of two detention officers employed by the Lincoln Park Police Department was held to be outside of the § 2(1) scope of Act 312 because not comprised of "policemen * * * or subject to the hazards thereof". Proceeding from the determination that Act 312 was legislatively forged to prevent work stoppages by certain public employees which would threaten community safety, the Court of Appeals remarked:

"Although it can be argued that a strike by noncritical police department employees could burden police officers with nonemergency duties, thereby adversely affecting the operation of the entire department and possibl[y] causing indirect harm to the public due to weaker patrols or overworked officers, we do not think that the act was meant to be so all-encompassing. Work stoppages by almost any group of public employees could theoretically cause an extra burden on the police department. For example, a strike by street and highway personnel could cause defective traffic lights to become unreported and force some police officers to shift to traffic directing duties thereby weakening other sections of the police force." *Id.,* 365.

A similar argument was posited and rejected in dicta by another panel in *Ypsilanti Police Officers Ass'n v Eastern Michigan University,* 62 Mich App 87; 233 NW2d 497 (1975), with respect to the

The second interpretation focuses solely on the *critical-service employment status of the complaining employee forwarding the dispute*. As such, regardless of the critical-service nature of the interested municipal department/employer, if the complainant is found to be a county department employee subject to the hazards of police work pursuant to the literal terms of § 2(1), that party will be considered a § 3 "public police * * * department employee" whose dispute may be resolved through initiation of Act 312 proceedings. Under this interpretation, literal satisfaction of the § 2(1) scope criterion that the complainant be subject to the hazards of police work is thought to engage the totality of inquiry without the necessity of considering whether invocation of the act's proceedings to resolve that party's dispute would effectuate the act's manifest intent as a whole. This narrow interpretive analysis was employed by both the MERC[2] and the Court of Appeals[3] to hold the dispute of the instant prosecutor's investigators subject to Act 312 arbitration; other panels of our Court of Appeals and the MERC, as well as the Attorney General have likewise pursued this singular interpretive analysis to resolve similar eligibility questions.[4]

---

relationship of Ypsilanti Police Department officers and campus police of the University.

[2] *Oakland County (Prosecutor's Investigators)*, 1978 MERC Lab Op 328, 331-332.

[3] *In the Matter of the Petition of Metropolitan Council 23, AFSCME*, 89 Mich App 564, 562-573; 280 NW2d 600 (1979).

[4] In *Lincoln Park Detention Officers v Lincoln Park*, 76 Mich App 358, 365-366; 256 NW2d 593 (1977), a voluntary association of two detention officers employed by the Lincoln Park Police Department were held to be outside of the § 2(1) scope of Act 312 because not "policemen * * * or subject to the hazards thereof". More recently, however, in *Local No 214, Teamsters v Detroit*, 91 Mich App 273; 283 NW2d 722 (1979), another panel held guards of the Detroit House of Correction employed by the City of Detroit to be within the § 2(1) scope of Act 312.

The MERC has likewise centered its attention on § 2(1) in determin-

The third interpretation converges on the *critical-service status of both the complainant employee and the interested department/employer.* In accordance with this interpretation, it is only when both critical-service elements are satisfied that the act's § 1 purpose and policy will be effectuated, *i.e.,* to resolve a "public police * * * department employee's dispute", where "it is requisite to the high morale of such employees and the efficient operation of such departments" for averting critical-service work stoppages. Under this dual, whole-act interpretation, two premises must be satisfied. First, the particular complainant employee must be subject to the hazards of police work; it is not enough that the interested department/employer merely employ at least two persons engaged in that capacity who are not complainants. Second, the interested department/employer must be a critical-service county department engaging such complainant employees and having as its principal function the promotion of the public safety, order and welfare so that a work stoppage in that department would threaten community safety; again, it is not enough that the

ing Act 312 eligibility. In *Oakland County Sheriff's Dep't,* 1977 MERC Lab Op 843, 848-849, the MERC held clerk III, department clerk, account clerk, typist I and II, police communication agent, first cook, second cook, police para-professional and maintenance laborer "non-police classifications" engaged by the Oakland County Sheriff's Department outside the scope of § 2(1) "policemen * * * or subject to the hazards thereof". Similarly, in an unpublished opinion of the Attorney General (No 5154, April 21, 1977), fire fighting personnel employed by the Wayne County Road Commission at the Wayne County Metropolitan Airport were opined to be "fire fighters" as defined by § 2(1).

Compare *Ypsilanti Police Officers Ass'n v Eastern Michigan University,* 62 Mich App 87; 233 NW2d 497 (1975), where the Court of Appeals ruled in a similar vein that Eastern Michigan University, which employed commissioned police officers with a close nexus to Washtenaw County Sheriff's Department, was not a § 2(1) department of a "city, county, village or township" and therefore its employees could not invoke Act 312. Focus again remained on § 2(1).

interested department/employer merely employ at least two persons who fulfill the first premise whether or not complainants. Only when both premises are fulfilled may the benefits of Act 312's "alternate, expeditious, effective and binding procedure for the resolution of a ["public police * * * department employee's dispute"]" be initiated by the critical-service complainant, because it is "requisite to the high morale of such employees and the efficient operation of such departments". Unlike its distinct interpretive counterparts, this third mode of interpretive analysis employs both the literal § 2(1) scope provision and the § 1 purpose provision in determining whether the championed dispute is embraced by the act's intended coverage.

We are persuaded that the third mode of dual analysis is the appropriate one for ascertaining whether the instant prosecutor's investigators may initiate Act 312 proceedings to resolve their dispute as critical-service "public police * * * department" employees. Applying that dual, third mode of interpretive analysis to the facts of this case, it emerges that although these investigators are subject to the hazards of police work and although the Oakland County Prosecutor's Department is literally a county department engaging such employees, we are unpersuaded that the Oakland County Prosecutor's Department constitutes an intended "public police department" so that allowing either itself or its investigators to resolve their dispute pursuant to Act 312 will effectuate the whole act's intent as either (1) "requisite to the high morale of [the Oakland County Prosecutor's Department] employees" or (2) requisite to "the efficient operation of [the Oakland County Prosecutor's Department]" or (3) necessary for averting critical-service

strikes which would likely impede the public safety, order and welfare. While the prosecutor's investigators as well as the Oakland County Prosecutor's Department each literally satisfy the requirements of the § 2(1) scope provision, invocation of the act to resolve their dispute is not embraced by the act's paramount intent expressed in § 1 and discerned from case law since the Oakland County Prosecutor's Department does not constitute an intended critical-service "public police department".

For these reasons, we hold that the instant dispute is not subject to Act 312 coverage. As this Court early stated in *Common Council of Detroit v Rush,* 82 Mich 532, 542; 46 NW 951 (1890):

"[A] thing which is within the spirit of a statute is within the statute, although not within the letter; and a thing within the letter is not within the statute, unless within the intention."

Accordingly, we reverse both the MERC and the Court of Appeals.

## I. FACTS

Appellee Metropolitan Council 23, American Federation of State, County and Municipal Employees, AFL-CIO, is the labor representative for a separate bargaining unit of 17 prosecutor's investigators employed by the Oakland County Prosecutor's Department as authorized by MCL 49.31; MSA 5.791.[5] In April, 1977, appellee and appellant

---

[5] That section provides as follows:

"Sec. 1. In each county of the state of Michigan, the board of supervisors of such counties, at their regular annual meeting, may, by resolution authorize the appointment by the prosecuting attorney of said county of as many assistant prosecuting attorneys as said board of supervisors shall deem necessary, and shall in addition authorize

Oakland County reached an impasse in their negotiations to establish a labor contract. Appellee thereupon sought submission of the dispute to MERC for compulsory interest arbitration as "employees" of a "public police * * * department". MCL 423.233; MSA 17.455(33). Appellant challenged this request on the ground that the complaining prosecutor's investigators did not come within the act's § 2(1) statutory purview as "policemen, * * * or subject to the hazards thereof". MCL 423.232(1); MSA 17.455(32)(1).

On October 6, 1977, MERC conducted a hearing to determine whether the prosecutor's investigators could properly invoke the Act 312 arbitral mechanism. Two witnesses—prosecutor's investigators[6]—testified on behalf of appellee; appellant presented no witnesses.

At the hearing it was developed that the 17 prosecutor's investigators were assigned to four divisions of the Oakland County Prosecutor's Department as follows: Organized Crime Strike Force, 7; Criminal Investigation, 5; Welfare Fraud, 4; and Consumer Fraud, 1. As their title implies, the principal function of these individuals involved

the appointment by said prosecuting attorney, of such investigating officers, clerks, stenographers and other clerical employes as said board of supervisors shall deem necessary." MCL 49.31; MSA 5.791.

[6] At the MERC hearing, two Oakland County prosecutor's investigators testified with respect to the nature of their employment. The first witness, Donald Corey, had been employed by the Oakland County Prosecutor's Department for approximately two and one-half years as a prosecutor's investigator for the Organized Crime Strike Force. Prior to his term with the Prosecutor, Mr. Corey had served 13 years as a police officer in Bloomfield Township. The other witness, Robert Michael, had been a prosecutor's investigator for approximately two and one-half years and was assigned to the Criminal Investigation Division of the Oakland County Prosecutor's Department. Previously, Mr. Michael had served as a deputy patrolman with the Oakland County Sheriff's Department for approximately five and one-half years. Appellant presented no witnesses but did offer an opening argument. Both parties stipulated to the filing of briefs in lieu of closing argument.

surveillance and investigation necessary to assist the County Prosecutor and his Assistants in the prosecution of criminal activity in Oakland County; their function did not include the per se prevention of criminal activity at its inception. All four divisions were supervised by a Chief Criminal Investigator, a former police officer and detective, who reported to the Prosecutor.

Of the 17 investigators, 15 had prior police experience and, at the time of the hearing, were deputized by the Oakland County Sheriff; their deputization was subsequently withdrawn effective July, 1978. The two remaining nondeputized investigators who did not share prior police experience were described as engaged in duties substantially similar to those of their deputized colleagues.

Testimony was elicited that the investigators were required to carry a weapon by oral directive of their division supervisor; this was not required by departmental regulation of the Oakland County Prosecutor. On occasion, the investigators had found it necessary to employ their weapons. Certain investigators had suffered non-weapon-related injury in the execution of their investigatory functions.

It was related that although the specific investigative tasks of the prosecutor's investigators varied from division to division, as a result of their investigations they made arrests, booked and "mugged" prisoners and prepared arrest reports. Indeed, one witness testified that in the first nine months of 1977, the investigators had effected approximately 190 arrests during their investigations of various completed criminal offenses. Although they were wholly under the aegis of the Oakland County Prosecutor's Department, it was reported not to be uncommon for the prosecutor's

investigators to cooperate with both state and local police detectives.

Although appellant presented no witnesses, it countered in its opening argument that since the investigators were primarily engaged in the performance of investigative duties collateral to prosecution rather than enforcement, were not subject to the daily encounters of front-line police officers, and did not function in a manner "critical" to the maintenance of public order and safety, they could not properly be characterized as "policemen * * * or subject to the hazards thereof".

On the basis of the record, as well as the parties' briefs, on March 8, 1978 the MERC issued its decision and order favorable to the investigators as being within the § 2(1) scope of Act 312, stating:

"On the basis of this record, we find that the duties of the Oakland County Prosecutor's Investigators go beyond the information-gathering process and directly involve them in law enforcement. See *Oakland County Sheriff's Dep't,* [1977] MERC Lab Op 843. Although they do not carry the title of 'police officer,' we find that *the record supports the conclusion that they are clearly subject to the hazards of police work and thus within the scope of Act 312." Oakland County (Prosecutor's Investigators),* 1978 MERC Lab Op 328, 331-332. (Emphasis supplied.)

On April 16, 1979, the Court of Appeals affirmed the MERC ruling as supported by competent, material and substantial evidence on the whole record. *In the Matter of the Petition of Metropolitan Council 23, AFSCME,* 89 Mich App 564, 569-573; 280 NW2d 600 (1979). The Court of Appeals opined that MERC had "applied the correct statutory standard in its decision below *[i.e., "the sole statutory precondition for invoking Act 312,* other than employment by a municipal or county department,

*is that the employees be 'either police officers or subject to the hazards of police officers' ]", id.,* 570, and held that "the evidence adduced at the MERC hearing substantially supports MERC's conclusion that the *investigators are subject to the same hazards confronting police officers and may invoke* compulsory arbitration under Act 312", *id.,* 572-573 (emphasis supplied).

We granted leave to appeal on July 19, 1979.[7] 406 Mich 1011 (1979). Oral argument was heard on January 10, 1980.

## II. PRINCIPLES OF STATUTORY CONSTRUCTION: THE WHOLE ACT

From the litigant's viewpoint in statutory litigation of this type, the practical inquiry is usually framed in the basic determination of a particular provision's, clause's or word's meaning. Unremarkably, to satisfactorily fulfill that inquiry one must proceed in the same manner one would in considering any other composition—construe the object of inquiry with reference to the leading idea or purpose of the whole instrument. Indeed, much like any other literary composition, a statute is enacted as a whole rather than in parts or sections and is animated by one general purpose and intent. Consequently, each part or section must be considered in connection with every other part or section and the meaning ascribed to any one sec-

---

[7] We granted leave to appeal on July 19, 1979 and "directed [the parties] to include among the issues to be briefed (1) whether the Oakland County Prosecutor's investigators are 'policemen * * * or subject to the hazards thereof' within the meaning of § 2 of 1969 PA 312, and (2) whether 1969 PA 312 unconstitutionally provides for appointment of arbitrators who lack political accountability". 406 Mich 1011 (1979). Because the act's constitutionality has been recently resolved in *Detroit v Detroit Police Officers Ass'n,* 408 Mich 410; 294 NW2d 68 (1980), we will necessarily restrict our inquiry to the first issue in general.

tion arrived at after due consideration of the act as a whole so as to produce, if possible, a harmonious and consistent enactment as a whole. *Grand Rapids v Crocker,* 219 Mich 178, 182-184; 189 NW 221 (1922). Sometimes, it is possible to construe an act by dividing it by a process of etymological dissection, apply to each word, clause or provision thus separated from its context some particular meaning given by lexicographers, and then rigidly reconstruct the instrument upon the basis of those intrinsic meanings. More often, however, an act must be construed as a whole, and the particular effect to be attached to any word, clause or provision determined from the context of the whole act, the nature of the treated subject matter, and the purpose or intention of the body which promulgated the act.

While it is axiomatic that this Court must enforce clear and unambiguous statutory provisions as written, *Nordman v Calhoun,* 332 Mich 460, 465; 51 NW2d 906 (1952); *Ypsilanti Police Officers Ass'n v Eastern Michigan University,* 62 Mich App 87, 92; 233 NW2d 497 (1975), it is equally true that "[w]hat is 'plain and unambiguous' often depends on one's frame of reference". *Shiffer v Board of Education of Gibraltar School Dist,* 393 Mich 190, 194; 224 NW2d 255 (1974). The whole act provides this proper "frame of reference" in cases of statutory construction: "A statutory provision that is in dispute must be read in light of the general purpose of the act and in conjunction with the pertinent provisions thereof." *Romeo Homes, Inc v Comm'r of Revenue,* 361 Mich 128, 135; 105 NW2d 186 (1960).

It is equally axiomatic, therefore, that "the intention of the Legislature, when discovered, must prevail, any existing rule of construction to the

contrary". *Michigan Central R Co v Michigan,* 148 Mich 151, 156; 111 NW 735 (1907). Neither clinical construction nor the letter of the statute nor its rhetorical framework should be permitted to defeat the act's purpose and intent as gathered from consideration of the whole act. As eloquently stated by Justice GRANT in *Common Council of Detroit v Rush,* 82 Mich 532, 542; 46 NW 951 (1890): "[A] thing which is within the spirit of a statute is within the statute, although not within the letter; and a thing within the letter is not within the statute, unless within the intention." This principle was more recently stated in *Aikens v Dep't of Conservation,* 387 Mich 495, 499; 198 NW2d 304 (1972): "It is well settled that the proper construction of any statute is for the court. The purpose of the court in interpreting a statute is to give effect to the legislative intent. If there is a conflict, the spirit and purpose of the statute should prevail over its strict letter." (Citations omitted.)

In such instances of conflict, courts "are authorized to collect the intention of the Legislature from the occasion and necessity of the law—from the mischief felt, and the objects and remedy in view; and the intention is to be taken, or presumed, according to what is consonant to reason and good discretion". *Sibley v Smith,* 2 Mich 486, 492 (1853). " 'Where the language of a statute, in its ordinary meaning and grammatical construction, leads to a manifest contradiction of the apparent purpose of the enactment, or to some inconvenience or absurdity, hardship or injustice, presumably not intended, a construction may be put upon it' " so that those unintended ends are avoided. *Elba Twp v Gratiot County,* 287 Mich 372, 394; 283 NW 615 (1939). This fundamental rule of

statutory construction was recently reaffirmed in *Salas v Clements,* 399 Mich 103, 109; 247 NW2d 889 (1976), where it was remarked: "[D]eparture from the literal construction of a statute is justified when such construction would produce an absurd and unjust result and would be clearly inconsistent with the purposes and policies of the act in question."

### III. THE LEGISLATIVE INTENT OF ACT 312

Since §§ 1, 2(1) and 3 evidence an inherent ambiguity respecting "public police department" eligibility to invoke the act's benefits for resolving a "public police * * * department employee's dispute", resort must be made to a determination of the act's underlying intent. Once this intent is discerned, that ambiguity must be resolved in such a manner as to effectuate the Legislature's intendment.

In response to a February, 1967 Report of the Governor's Advisory Committee on Public Employee Relations, Act 312 was enacted in 1969 as an experiment designed to relieve the tension involved in the "limited area" of "police and fire fighters" labor disputes. *Dearborn Fire Fighters Union Local No 412, IAFF v Dearborn,* 394 Mich 229, 279, fn 5; 231 NW2d 226 (1975) (opinion of COLEMAN, J.). As stated in § 14, MCL 423.244; MSA 17.455(44), Act 312 was enacted as supplemental to the public employment relations act (PERA) which prohibits strikes by all public employees but, significantly, does not provide for binding arbitration of their interest disputes. MCL 423.201 *et seq.;* MSA 17.455(1) *et seq.*

As a consequence of the fact that illegal strikes in the public sector nonetheless resulted from

negotiation impasses, Act 312 was enacted "to afford an alternate, expeditious, effective and binding procedure for the resolution of disputes ["in public police and fire departments, where the right of employees to strike is by law prohibited"]", MCL 423.231; MSA 17.455(31). The availability of the act's "alternate * * * and binding procedure" was legislatively deemed necessary to effectuate the "public policy of this state that in public police and fire departments, * * * it is requisite to the high morale of such employees and the efficient operation of such departments". MCL 423.231; MSA 17.455(31).

Although as originally enacted § 2 merely defined "[p]ublic police and fire departments" to include "[county department] employees engaged as policemen, * * * or subject to the hazards thereof", 1969 PA 312, it was subsequently amended in both 1976 and 1977 to embrace "emergency medical service personnel employed by a police or fire department [1976 PA 203], or an emergency telephone operator employed by a police or fire department [1977 PA 303]", MCL 423.232(1); MSA 17.455(32)(1); expressly excluded from the act's scope by the former amendment were persons employed by a private, contracting emergency medical service company as well as emergency service personnel "whose duties are solely of an administrative or supporting nature". MCL 423.232(3); MSA 17.455(32)(3). In the analysis of 1976 House Bill 5371 prepared by the Analysis Section of the House of Representatives Committee on Labor which considered the emergency medical service personnel amendment, it emerges that this legislative modification was addressed to the position of the City of Detroit that "since [civilian] EMS personnel were not engaged in actual police or fire work" they could not invoke the act's

provisions. In the Analysis Section summary of the "argument against" the inclusion of such parties, it was remarked by the Analysis Section that "[t]he intent of Act 312 is to ensure against a strike by employees whose service is unique and essential, and EMS personnel do not fit this criteria *[sic]*". The thrust of the "argument for" their inclusion was succinctly stated:

"The obvious intent of the Legislature was to forestall any serious disruption of ["municipal police and fire departments"], not only of a particular group of employees within the department. * * * The service [emergency medical service personnel] provide is as valuable to the public as that provided by other fire or police department employees, and a disruptive labor dispute among these employees would be just as detrimental to the public welfare as a strike by policemen or firemen. These employees need and deserve the protection of the act."

Comparing the practical impact of the PERA and Act 312 supplementary concepts, now-Chief Justice COLEMAN summarized the *raison d'être* of the compulsory interest arbitration scheme in the following terms:

"PERA procedurally requires the parties to meet at the bargaining table and confer in good faith with an open mind and a sincere desire to reach an agreement. It does not mandate agreement. If the parties fail to agree on one or more mandatory subjects, an 'impasse' situation is reached and the employer may take unilateral action on an issue consistent with its final offer to the employees' representative. The duty to bargain is then suspended until there is a change in the surrounding conditions or circumstances.

"In the private sector 'impasse' often results in a strike. The employees refuse to accept the unilateral conditions imposed by the employer and withhold their

services as a bargaining weapon. In the public sector strikes are prohibited but nevertheless occur. If the public employees do strike, the public employer may resort to the courts in order to return the labor situation to the status quo. By the time that court relief is obtained, however, the public may well have been left for a long period without the services and protection of the striking employees.

"When policemen engage in a strike, the community becomes immediately endangered by the withdrawal of their services. Likewise, our case law has often focused on the fact that fire fighters have a distinct and crucial employment relationship with a public employer.

"The Legislature, with knowledge of the vital character of police and fire services and with reference to the specific recommendations of the Governor's Advisory Committee on Public Employee Relations (February, 1967) moved to foreclose strikes to police officers and fire fighters by enacting 1969 PA 312." *Dearborn, supra,* 278-279 (footnotes omitted).

In *Dearborn, supra,* four members of this Court had occasion to assess the constitutional propriety of Act 312. In this pursuit, the purpose as well as legislative intent underlying the act's provisions were variously described by three Justices.

As quoted above, Justice COLEMAN discerned that the Legislature promulgated Act 312 "with knowledge of the vital character of police and fire services", *id.,* 279, including the characteristic that "[w]hen policemen engage in a strike, the community becomes immediately endangered by the withdrawal of their services". *Id.*

Implicitly distinguishing Act 312 compulsory binding interest arbitration from PERA grievance arbitration, Justice LEVIN cast the former in terms of "a new concept designed to avoid the disastrous economic and social consequences of labor strife" and having as "its underlying rationale: the preservation and advancement of the public interest".

*Id.,* 255. "It is the public interest which justifies governmental intervention and governmental imposition of a resolution upon the parties so that the flow of essential goods and services may continue and the economy and government can function in an orderly and productive manner." *Id.,* 255. Justice Levin summarized the legislative intent animating Act 312 as follows:

"The challenged act represents a legislative attempt to prevent the dire consequences of strikes or work stoppages by certain public employees—policemen and firemen." *Id.,* 247.

As characterized by Justice Williams: "Compulsory [interest] arbitration is a practical response to the impasse experienced from time to time in collective bargaining where the public welfare cannot endure the impact of a work stoppage while awaiting the resolution of problems through normal negotiations". *Id.,* 292-293. The principal advantage of the Act 312 arbitration scheme was described by Justice Williams as providing a "successful and effective labor management tool that has prevented costly work stoppages which could produce crisis situations". *Id.,* 323.

These various formulations of the legislative intent underlying Act 312 were tersely expressed by our Court of Appeals in *Lincoln Park Detention Officers v Lincoln Park,* 76 Mich App 358, 364-365; 256 NW2d 593 (1977), where it was held that a voluntary association of two detention officers employed in the county police department were outside "of the Legislature's intended scope of the act" since their coverage would not effectuate the intent that "[w]ork stoppages by certain public employees, *e.g.,* police officers and fire fighters, can threaten the safety of the entire community, *Dear-*

*born * * *, supra,* at 247, 279, 293, and these statutes aim at preventing such work stoppages". See *Metropolitan Council 23 v Center Line,* 78 Mich App 281, 284; 259 NW2d 460 (1977). See also *Oakland County Sheriff's Dep't,* 1977 MERC Lab Op 843, 847 ("Act 312, * * * was enacted in order to prevent strikes in the most vital areas of public safety.").

Thus, although variously described, it is evident that Act 312 was legislatively intended to provide an alternate, binding procedure for the resolution of interest disputes in critical-service municipal police and fire departments as well as the aversion of otherwise proscribed critical-service strikes which, because of the vital, unique and essential character of police and fire services, would likely cause an imminent, serious threat to the public order, safety and welfare as well as undermine the high morale and efficient operation of the departments.

## IV. DISCUSSION

Guided by the manifest intent of Act 312 to avert critical-service work stoppages and the statutory maxims that "a thing within the letter is not within the statute, unless within the intention", *Common Council of Detroit, supra,* 542, and "departure from the literal construction of a statute is justified when such construction would produce an absurd and unjust result and would be clearly inconsistent with the purposes and policies of the act in question", *Salas, supra,* 109, we are now prepared to assess the three interpretations set forth to determine whether a "public police * * * department employee's dispute" is presented on the facts of this case.

*A. Status of the Interested Department/Employer*

Section 2(1) provides in pertinent part that "[p]ublic police * * * departments means any department of a * * *, county, * * * having employees engaged as policemen, * * * or subject to the hazards thereof". Guided by a literal reading of § 2(1) alone, the first interpretation concentrates sole attention on the status of the interested department/employer. If the interested department/employer is (i) a department, (ii) of a county, (iii) having somewhere within its ranks, not limited to the particular complaining employee, (iv) more than one employee engaged subject to the hazards of police work, then, pursuant to § 3, either "the employees or employer may initiate binding arbitration proceedings" to resolve "a public police * * * department employee's dispute".

By the literal terms of § 2(1), fulfillment of the four composite elements is thought sufficient under this first, literal interpretation to activate the Act 312 statutory scheme in favor of *all* departmental employees' disputes provided more than one county department employee is engaged in a capacity subject to the hazards of police work. This is so regardless of either the interested department's/employer's principal function or charter— *e.g.*, city administrative department, county library, township sanitation department—or the complaining employee's station—*e.g.*, janitor, cook, clerical. Confined by this literal interpretation of § 2(1), no reference is made to whether operation of the act in favor of either this interested department/employer or each of its employees would effectuate the act's manifest intent to avert critical-service work stoppage although literally presented with a § 2(1) "public police * * * department".

Theoretically, therefore, if a county library employed two individuals somewhere within its ranks in a capacity subject to the hazards of police work, and a library receptionist sought Act 312 resolution of an interest dispute with the library employer, the act's "alternate, expeditious, effective and binding procedure for the resolution of disputes" would become available to the receptionist as a § 3 "public police * *. * department employee". As stated in § 1, permitting that receptionist to initiate Act 312 proceedings would arguably be "requisite to the high morale of such [county library] employees and the efficient operation of such [county library] departments" for averting critical-service work stoppages.

Although the literal terms of § 2(1) would require us to conclude that the theoretical county library is a "public police department" subject to Act 312 coverage because of its literal status, we are unpersuaded that the Legislature intended such an absurd result. Two panels of our Court of Appeals have rejected similar interpretations in dicta.[8]

We are likewise unpersuaded that the Legislature intended these prosecutor's investigators' dispute to be resolved in accordance with the Act 312 mechanism. Literally, although these investigators are subject to the hazards of police work and are engaged in such capacity by a county department, we feel that submission of their dispute to Act 312 arbitration would not effectuate the general legislative intent to avert critical-service work stoppages. Reading the act as a whole and guided by the act's manifest intent, we must conclude that, much like the example of the theoretical county library employing two persons subject to the haz-

---

[8] See footnote 1, *supra,* and accompanying text.

ards of police work and the theoretical library receptionist, to permit the investigators' dispute to achieve Act 312 status solely because the Oakland County Prosecutor's Department literally fulfills the four elements of § 2(1) would be neither consonant with the legislative intent nor sound reason. Where, as here, " 'the language of a statute, in its ordinary meaning and grammatical construction, leads to a manifest contradiction of the apparent purpose of the enactment, or to some inconvenience or absurdity, hardship or injustice, presumably not intended, a construction may be put upon it,' " so that those unintended ends are avoided. *Elba Twp, supra,* 394. "[A] thing within the letter is not within the statute, unless within the intention." *Common Council of Detroit, supra,* 542.

"[D]eparture from the literal construction of a statute is justified when such construction would produce an absurd and unjust result and would be clearly inconsistent with the purposes and policies of the act in question." *Salas, supra,* 109. We do not perceive that the Legislature intended compulsory interest arbitration in favor of the Oakland County Prosecutor's Department to constitute "a practical response to the impasse experienced from time to time in collective bargaining where the public welfare cannot endure the impact of a work stoppage while awaiting the resolution of problems through normal negotiations". *Dearborn, supra,* 292-293 (opinion of WILLIAMS, J.).

*B. Critical-Service Status of the Complaining Employee*

Also reading § 2(1) alone, the second interpretation focuses sole attention on the critical-service status of the complaining employee. Under this interpretation, regardless of the critical-service nature of the interested municipal department/

employer, if the complainant constitutes more than one (i) county (ii) department (iii) employee (iv) subject to the hazards of police work, then that particular complainant will be considered a § 3 "public police * * * department employee" whose dispute may be resolved through initiation of Act 312 proceedings. Literal satisfaction of the § 2(1) scope criterion that the county department employee be subject to the hazards of police work is thought to engage the totality of inquiry without the necessity of considering whether invocation of the act's proceedings to resolve that party's dispute would effectuate the whole act's intent to avert critical-service work stoppages.

Under this interpretation, the two individuals employed by the hypothetical county library in a capacity subject to the hazards of police work could invoke the act's significant benefits as being "requisite to the high morale of such [county library] employees and the efficient operation of such [county library] departments" for averting critical-service work stoppages. Sole emphasis is placed on the complaining employees' situation regardless of the interested department's/employer's principal function or character.

It is evident that the parties, the MERC and the Court of Appeals have each adopted this interpretation to determine whether these prosecutor's investigators may invoke the benefits of Act 312 to resolve their dispute by solely concentrating on the perceived polestar whether the investigators are within the act's § 2(1) literal scope as "subject to the hazards [of county department employees engaged as police officers]". That the parties and instant lower tribunals have exclusively devoted their energies to this single interpretive pursuit is borne out by the parties' testimony and argu-

ments, MERC's express holding that "[a]lthough [these prosecutor's investigators] do not carry the title of 'police officer', * * * they are clearly subject to the hazards of police work and thus within the scope of Act 312", *Oakland County, supra,* 331-332, and the Court of Appeals ruling in affirmance that MERC "applied the correct statutory standard in its decision below *[i.e.,* "the sole statutory precondition for invoking Act 312 other than employment by a municipal or county department, is that the employees be 'either police officers or subject to the hazards of police officers' "]", *Petition of Metropolitan Council 23, supra,* 570.

The occasion of such narrow analytic focus is certainly not surprising since it has likewise been employed by others—including other Court of Appeals panels, the MERC and the Attorney General —in seeking to answer whether similarly situated complainants may invoke Act 312.[9]

As succinctly stated in *Detroit v General Foods Corp,* 39 Mich App 180, 190; 197 NW2d 315 (1972):

"When a court reviews an administrative tribunal decision, it reviews the original record to determine if the decision is supported by competent, material and substantial evidence, and will overturn a decision only when such decision is *contrary to law,* or *is not supported by the necessary competent, material* and *substantial* evidence." (Emphasis in original.) See Const 1963, art 6, § 28; MCL 24.306, subds (d) and (f); MSA 3.560(206), subds (d) and (f). See also MCL 423.23(2)(e); MSA 17.454(25)(2)(e), MCL 423.242; MSA 17.455(42).

In reviewing the MERC finding in this matter that the prosecutor's investigators "are clearly subject to the hazards of police work and thus within the scope of Act 312", *Oakland County,*

---

[9] See footnote 4, *supra,* and accompanying text.

*supra,* 331-332, the Court of Appeals stated that it would "not reverse MERC's decision if it is supported by competent, material and substantial evidence on the whole record". *Petition of Metropolitan Council 23, supra,* 571. After reviewing the whole record, the panel held that "the evidence adduced at the MERC hearing substantially supports MERC's conclusion that the investigators are subject to the same hazards confronting police officers and may invoke compulsory arbitration under Act 312". *Id.,* 572-573. This conclusion apparently proceeded from the panel's notion that "the sole statutory precondition for invoking Act 312, other than employment by a municipal or county department, is that the employees be 'either police officers or subject to the hazards of police officers.' " *Id.,* 570.

We agree in part and disagree in part with the rulings of both the MERC and the Court of Appeals.

Cognizant of our limited standard of review of administrative factual findings summarized in *General Foods Corp, supra,* as to the limited factual finding that these investigators are "subject to the hazards [of police work]", we agree that this ruling is supported by competent, material and substantial evidence on the whole record. Guided by this facet of our restrictive standard of review, we afford due deference to administrative expertise and decline to "invade the province of exclusive administrative fact-finding by displacing an agency's choice between two reasonably differing views". *Michigan Employment Relations Comm v Detroit Symphony Orchestra, Inc,* 393 Mich 116, 124; 223 NW2d 283 (1974).

Beyond this factual ruling, however, we hold that both the MERC and the Court of Appeals

erred as a matter of law in permitting these investigators to initiate Act 312 proceedings simply because they are county department employees subject to the hazards of police work. Both tribunals erred in merely addressing whether six isolated words found in the § 2(1) scope provision had been literally satisfied without any consideration given to the harmonious and consistent effectuation of the legislative intent underlying the act as a whole to avert critical-service work stoppages. Fulfillment of these six isolated words is not, as the Court of Appeals apparently thought, "the sole statutory precondition for invoking Act 312". *Petition of Metropolitan Council 23, supra,* 570.

Rather than engaging the totality of inquiry, we regard these literal terms of § 2(1) as merely providing an isolated benchmark for ascertaining whether a complainant comes within the act's *literal scope* as distinguished from its *conditio sine qua non*—the act's *intendment. Conditio praecedens adimpleri debet priusquam sequatur effectus.* To terminate inquiry at the isolated juncture of these six words blinks the reality that Act 312 must be considered as a whole. The particular effect to be attached to the finding that a complainant is subject to the hazards of police work must be derived from the whole act, the nature of the treated subject matter, and the purpose or intention of the promulgating body so as to ultimately effectuate the manifest legislative intent and to avoid unintended, absurd or unjust results. Guided by these time-honored notions of statutory construction, we must conclude that in disregarding the legislative intent of the act as a whole, the lower tribunals chose to exalt form over substance, defying the maxim that "a thing within the letter is not within the statute, unless within the inten-

tion". *Common Council of Detroit, supra,* 542. As in the example of the two county library complainants, permitting these investigators' dispute to achieve Act 312 status simply because they are Oakland County Prosecutor's Department employees subject to the hazards of police work would be neither consonant with sound reason nor good judgment in effectuating the legislative intent to avert critical-service work stoppages.

Act 312 was legislatively intended to provide an alternate, expeditious, effective and binding procedure for the resolution of interest disputes and the aversion of otherwise proscribed critical-service strikes which, because of the vital, unique and essential character of police and fire services, would likely cause an imminent, serious threat to the public order, safety and welfare as well as undermine the high morale and efficient operation of the subject departments. Because of the non-critical-service nature of the Oakland County Prosecutor's Department, we are unpersuaded that permitting these 17 prosecutor's investigators to invoke the supplemental provisions of Act 312 would effectuate this legislative intent in either any of its specifics or as a whole although the investigators are arguably subject to the hazards of county department employees engaged as police.

We cannot perceive that invoking Act 312 to resolve this dispute would be either "requisite to the high morale of [the Oakland County Prosecutor's Office] employees" or requisite to "the efficient operation of [the Oakland County Prosecutor's Office]". Like any other public employee of this state, these prosecutor's investigators are proscribed from striking by the supplementary dictates of PERA. Thus, they may resort to its provisions for labor dispute protections in general with-

out the necessity of invoking Act 312's "alternate expeditious, effective and binding procedure for the resolution of disputes". Because of the principal function of the Oakland County Prosecutor's Department, even if these prosecutor's investigators were to evade PERA and engage in an illegal strike upon the occasion of an impasse, we are unpersuaded that, prior to the obtainment of court relief pursuant to PERA, such illegal activity would invade the public order, safety and welfare and endanger the community in a manner even similar to that contemplated by Act 312. Given the Prosecutor's Department's practical duties, permitting these prosecutor's investigators to invoke the benefits of Act 312 would neither "prevent the dire consequences of strikes or work stoppages by certain public employees", *Dearborn, supra,* 247 (opinion of LEVIN, J.), nor engage "a practical response to the impasse experienced from time to time in collective bargaining where the public welfare cannot endure the impact of a work stoppage while awaiting the resolution of problems through normal negotiations", *Dearborn, supra,* 292-293 (opinion of WILLIAMS, J.). Furthermore, unlike the successful argument for inclusion of emergency medical service personnel in § 2(1), we cannot perceive that "[t]he service [these 17 Oakland County Prosecutor's Department investigators] provide is as valuable to the public as that provided by other fire or police department employees, and a disruptive labor dispute among these employees would be just as detrimental to the public welfare as a strike by policemen or firemen". Analysis of 1976 House Bill 5371, *supra.* Neither clinical construction nor the letter of the statute nor its rhetorical framework should be permitted to defeat the act's manifest intent and

purpose gathered from consideration of the act as a whole.

## C. Critical-Service Status of Both the Interested Department Employer and the Complaining Employee

As we have just discussed, it is only when both the complaining employee and the interested department/employer enjoy critical-service status that invocation of Act 312 will effectuate its purpose and policy, *i.e.,* to resolve a "public police * * * department employee's dispute" where "it is requisite to the high morale of such employees and the efficient operation of such departments" for averting critical-service work stoppages.

Under this dual, whole-act interpretation, two premises must be satisfied. First, the particular complainant employee must be subject to the hazards of police work; it is not enough that the interested department/employer merely employ at least two persons engaged in that capacity who are not complainants. Second, the interested department/employer must be a critical-service county department engaging such complainant employees and having as its principal function the promotion of the public safety, order and welfare so that a work stoppage in that department would threaten community safety; again, it is not enough that the interested department/employer merely employ at least two persons who fulfill the first premise whether or not complainants. Only when both premises are fulfilled may the benefits of Act 312's "alternate, expeditious, effective and binding procedure for the resolution of [a "public police * * * department employee's dispute"]" be initiated by the critical-service complainant, because it is "requisite to the high morale of such employees and the efficient operation of such departments". Unlike its distinct interpretive counterparts, this

third mode of interpretive analysis employs both the literal § 2(1) scope provision and the § 1 purpose provision in determining whether the dispute is embraced by the act's intended coverage.

We are persuaded that the third mode of dual analysis is the appropriate one for ascertaining whether the instant prosecutor's investigators may initiate Act 312 proceedings to resolve their dispute as critical-service "public police * * * department" employees. Applying that dual third mode of interpretive analysis to the facts of this case, it emerges that although these investigators are subject to the hazards of police work and although the Oakland County Prosecutor's Department is literally a county department engaging such employees, we are unpersuaded that the Oakland County Prosecutor's Department constitutes an intended "public police department" such that allowing either itself or its investigators to resolve their dispute pursuant to Act 312 will effectuate the whole act's intent as either (1) "requisite to the high morale of [the Oakland County Prosecutor's Department] employees" or (2) requisite "to the efficient operation of [the Oakland County Prosecutor's Department]" or (3) necessary for averting critical-service strikes which would likely impede the public safety, order and welfare. While the prosecutor's investigators as well as the Oakland County Prosecutor's Department each literally satisfy the requirements of the § 2(1) scope provision, invocation of the act to resolve their dispute is not embraced by the act's paramount intent expressed in § 1 and discerned from case law since the Oakland County Prosecutor's Department does not constitute an intended critical-service "public police department".

## V. CONCLUSION

Guided by the standard of review for assessing

administrative action, we uphold the MERC factual finding that the instant complainants are "subject to the hazards [of county department employees engaged as police officers]" as supported by competent, material and substantial evidence on the whole record, but hold that both tribunals erred as a matter of law in ruling that these complainants may invoke Act 312 as having fulfilled "the sole statutory precondition for invoking Act 312, * * * that the employees be 'either police officers or subject to the hazards of police officers' ". *Petition of Metropolitan Council 23, supra,* 570. Guided by time-honored principles of statutory construction, and construing the act as a whole so as to effectuate its manifest intent as codified in § 1 and discerned from case law, we hold that permitting these investigators to invoke the act would be contrary to the legislative intent and would arguably lead to absurd and unjust results for which there is an otherwise acceptable and supplementary remedy, PERA. As remarked in *Common Council of Detroit, supra,* 542, "[A] thing within the letter is not within the statute, unless within the intention." Accordingly, we reverse both the MERC and the Court of Appeals. No costs, a public question being involved.

COLEMAN, C.J., and FITZGERALD, J., concurred with WILLIAMS, J.

RYAN, J. *(concurring in the result).* I concur in the result reached by my Brother WILLIAMS because I am persuaded that the Oakland County Prosecuting Attorney's investigators are not "employees engaged as policemen" whose strike would be likely to cause an imminent and serious threat

to public safety and were not intended by the Legislature to be included within the provisions of 1969 PA 312.

COLEMAN, C.J., concurred with RYAN, J.

BLAIR MOODY, JR., J. *(concurring in the result)*. I concur in the result reached by Justice WILLIAMS. While the Oakland County Prosecuting Attorney's investigators may function in some ways as "policemen", I do not think that the Legislature intended that these investigators should be included under the mantle of Act 312. Because the intent of the Legislature is dispositive in the present case, no view is taken as to whether a person who functions as a "policeman" but is not a member of a "police department" as such may be or was intended to be included among those protected by Act 312. There may be persons that the Legislature clearly intended to protect by the enactment of Act 312, who would not be afforded protection if the act were given too "strict" or "literal" an interpretation.

LEVIN, J. *(to affirm)*. Act 312[1] provides that when mediation of "a public police or fire department employee's dispute" over the terms of a new contract reaches impasse, either party may request that the dispute be resolved through compulsory, binding arbitration proceedings before a tripartite arbitration panel.[2] The issue presented is whether a collective bargaining impasse between Oakland County and 17 investigators employed by the Oakland County Prosecutor and represented by a dis-

---

[1] 1969 PA 312, MCL 423.231 *et seq.;* MSA 17.455(31) *et seq.*

[2] While I adhere to the view expressed in dissent that Act 312 is unconstitutional, a majority of the Court has held that the act is constitutional. *Detroit v Detroit Police Officers Ass'n,* 408 Mich 410; 294 NW2d 68 (1980).

tinct bargaining unit affiliated with Council 23 is a dispute within the intendment of the act.

The Michigan Employment Relations Commission found that the investigators met the statutory definition because they were "subject to the hazards" of police work, and that factual finding is not challenged on appeal.

Our colleague would confine the operation of the act by reading into it a requirement that the employees and the employer both have "critical-service status" and would find that the investigators do not satisfy the proposed requirement.

We would not introduce such a requirement. While Act 312 aims to provide a means of averting critical-service work stoppages by police officers and fire fighters, the act by its terms covers persons "subject to the hazards" of police work and fire fighting without inquiry whether a work stoppage by those persons would threaten community safety. We would affirm the MERC[3] and the Court of Appeals,[4] which held that these investigators are within the scope of Act 312 and therefore this bargaining impasse should be resolved through arbitration.

I

Our colleague would hold that the compulsory, binding arbitration proceedings provided by Act 312 to resolve collective bargaining impasses between employees of public police and fire departments and their department employers may be invoked "only when both the complaining employee and the interested department/employer

---

[3] *Oakland County (Prosecutor's Investigators)*, 1978 MERC Lab Op 328.

[4] *In the Matter of the Petition of Metropolitan Council 23, AFSCME*, 89 Mich App 564; 280 NW2d 600 (1979).

enjoy critical-service status". He writes that it is not consistent with the policy of the act to permit resolution of a collective bargaining impasse through arbitration unless "the particular complainant employee [is] subject to the hazards of police work" and the "interested department/employer [is] a critical-service * * * department * * * having as its principal function the promotion of the public safety, order and welfare so that a work stoppage in that department would threaten community safety".

It is asserted that the act should be so construed, in accordance with its "spirit" rather than its "letter", because an inherent ambiguity "regarding eligibility to invoke its intended coverage" "admits of three differing interpretations", two of which must be rejected as inconsistent with the act's "manifest intent" "to avert critical-service work stoppages".

We perceive no reason to add a gloss to the act which would limit its application to law-enforcement or fire-fighting personnel who provide "critical" services in "critical-service departments".

It is unnecessary to the disposition of this case to consider what might be the proper resolution of a case in which it was claimed that, simply because some of a county or city department's employees were "subject to the hazards of police work", *all* employees of that department were subject to arbitration of collective bargaining impasses under Act 312 irrespective of whether their positions exposed them to those hazards. No party to this case has urged such a construction of the act.

The appearance of ambiguity is magnified by the evocation of a hypothetical county library, all of whose employees are held subject to the act be-

cause it employs two persons in a capacity subject to the hazards of police work. The proposed solution, like the accompanying delineation of the problem, is unnecessarily sweeping. While the language of Act 312 is not entirely free from ambiguity, less restrictive approaches to its application are not foreclosed.

The question in the instant case is not whether employees who are neither policemen nor subject to the hazards of police work come within the act, but whether employees who are subject to the hazards of police work, although neither titled "policemen" nor employed by an agency called a police department, are subject to its provisions.

## II

Our reading of the act discloses no reason to suppose that the Legislature did not intend its coverage to extend to all persons "subject to the hazards" of police work without regard to whether employed in "critical-service" capacities.

According to its title, Act 312 "provide[s] for compulsory arbitration of labor disputes in municipal police and fire departments" and "define[s] such public departments * * *". Section 1 of the act declares that in "public police and fire departments" "[i]t is the public policy of this state * * * to afford an alternate, expeditious, effective and binding procedure for the resolution of disputes, and to that end the provisions of this act, providing for compulsory arbitration, shall be liberally construed".[5]

"[P]ublic police and fire departments" are defined by § 2(1) as:

---

[5] MCL 423.231; MSA 17.455(31).

"[A]ny department of a city, county, village, or township having employees engaged as policemen, or in fire fighting or subject to the hazards thereof, emergency medical service personnel employed by a police or fire department, or an emergency telephone operator employed by a police or fire department."[6]

Section 3 declares that either the employees or the employer may initiate binding arbitration of a "public police or fire department *employee's* dispute" which remains unresolved 30 days after its submission to mediation.[7] (Emphasis supplied.) Whether or not § 3 encompasses disputes involving employees of a department of local government who are not themselves "engaged as policemen * * * or subject to the hazards thereof", it can properly be understood as authorizing employees so engaged or their employer to initiate binding arbitration proceedings, for it is the presence of those employees which renders the department/employer a "public police and fire department" within the meaning of the act.

One can agree that the primary motivation for the passage of Act 312 was to forestall police and fire fighter work stoppages which might threaten community safety without conceding that the Legislature intended to limit the act's reach to cases where "both the complaining employee and the interested department/employer enjoy critical-service status". The Legislature has not used the word "critical" or any similar term in identifying

---

[6] MCL 423.232(1); MSA 17.455(32)(1).

The clause including emergency telephone operators was added by 1977 PA 303 while this case was pending before the MERC.

If all employees of police and fire departments were intended to fall within the act, there would have been no need to make separate provision for emergency medical service personnel and emergency telephone operators "employed by police or fire departments".

[7] MCL 423.233; MSA 17.455(33), as amended by 1977 PA 303.

the departments or employees within the scope of
Act 312 or in any other provision of the act. For
whatever reasons, the Legislature elected not to
define the class of disputes covered by the act in
terms of the urgency of the services at stake or the
potential threat that their interruption would pose
to the community. It may have determined that
such a standard would be too difficult to apply, or
it may have simply decided that all police officers,
fire fighters, or other persons subject to the same
hazards in their jobs, should be covered regardless
of their precise occupational classifications.

To permit the prosecutor's investigators or the
county to initiate arbitration proceedings to re-
solve their collective bargaining impasse would not
"defeat the act's purpose and intent" or be incon-
sistent with its "spirit".[8] To hold Act 312 applica-
ble in this case does not lead to "a manifest
contradiction of the apparent purpose of the enact-
ment, or to some inconvenience or absurdity, hard-
ship or injustice, presumably not intended". It is
not manifestly absurd or incredible to suppose that
the Legislature intended employees in the position
of these prosecutor's investigators to come within
the scope of the act. Indeed, the inclusion of the
words "or subject to the hazards thereof" in § 2(1)

---

[8] Our colleague stresses that "a thing which is within the spirit of
a statute is within the statute, although not within the letter; and a
thing within the letter is not within the statute, unless within the
intention." *Common Council of Detroit v Rush*, 82 Mich 532, 542; 46
NW 951 (1890). But this maxim is quoted from a case in which this
Court held that it would not be inconsistent with the spirit of an
elections law providing for private voting booths and other safeguards
of the secrecy of the ballot to allow blind and crippled voters to
receive assistance outside the polling places in the preparation of
their ballots, although no such provision was made in the act. Includ-
ing these prosecutor's investigators within the ambit of an act whose
terms appear to embrace them is a far cry from excluding otherwise
qualified voters from the franchise merely because a general statute
failed to make provision for physical inability to comply with its
requirements.

indicates that the Legislature did not intend to confine the act's coverage to police officers or fire fighters.

### III

It appears from our colleague's opinion that the gloss to be applied would cover all clauses of definitional § 2(1), regardless of whether the involved employees are nominally police officers or fire fighters or bear other occupational titles, or whether the involved departments are police or fire departments within the ordinary meaning of those terms or other governmental agencies.

We discern no indication in the act that the Legislature considered some police officers more important than others or regarded some departments as more indispensable than others. But the proposed analysis suggests that among the ranks of an ordinary police or fire department, some officers (e.g., those in charge of files, fingerprints and storage of evidence) might not meet the definition for arbitration along with their fellow officers. Moreover, the analysis leads either to the conclusion that the officers from municipal police departments who worked side-by-side with Oakland County Prosecutor's investigators on such assignments as gambling raids, narcotics surveillance and "buys", and the special child homicide task force, are not within the intendment of the act, or to the conclusion that those officers are subject to arbitration while the investigators are not solely because of departmental affiliation, although the act draws no distinctions between "public police and fire departments" meeting the § 2(1) definition.

### IV

It does not appear that the proposed limiting

gloss on the act received consideration from the MERC in this case.[9] We are without the benefit of its assessment of the suitability of such a construction and the practical advantages or difficulties that its adoption might engender. Before adopting such a construction, we should, at minimum, remand the cause to the MERC, whose perspective for gauging the impact of such a construction upon the operation of the act is superior to ours.[10]

In sum, we find no need to apply a broad gloss to the act to deal with hypothetical situations not presently before us. We would approve the determination of the MERC, well-grounded in the language of the act, that these investigators, whose positions involve them in law enforcement and subject them to the hazards faced by police officers, fall within the scope of Act 312. We would therefore affirm the judgment of the Court of Appeals.

KAVANAGH, J., concurred with LEVIN, J.

---

[9] The county's original response to a request from the MERC to "clarify the duties of the investigators" to facilitate "a determination * * * as to their eligibility for arbitration under Act 312" stressed that the investigators' "activities are not critical to the immediate day-to-day operation of protecting the public and their recognition as eligible for Act 312 compulsory arbitration would be inconsistent with the intentions of the act". The county's lawyer adverted to this argument in his opening statement before the MERC hearing officer. However, this argument was not further mentioned either in the county's post-hearing brief or in the MERC's decision and order.

[10] The MERC has previously endorsed the view stated by the Court of Appeals in *Lincoln Park Detention Officers v Lincoln Park,* 76 Mich App 358, 365; 256 NW2d 593 (1977), that Act 312 covers *employees* "engaged as police officers or fire fighters or subject to the hazards thereof".