599 N.W.2d 504 (1999)
235 Mich. App. 580
County of Montcalm, Appellee/Cross-Appellant, and
POLICE OFFICERS ASSOCIATION OF MICHIGAN and Command Officers Association of Michigan, Appellants/Cross-Appellees,
v.
FRATERNAL ORDER OF POLICE, MONTCALM COUNTY LODGE NO. 149, Appellant/Cross-Appellee.
Police Officers Association of Michigan and Command Officers Association of Michigan, Petitioners-Appellees,
v.
County of Montcalm and Montcalm County Sheriff, Respondents-Appellants.
Docket Nos. 202793, 202794, 210068.
Court of Appeals of Michigan.
Submitted May 11, 1999, at Grand Rapids.
Decided May 21, 1999, at 9:20 a.m.
Released for Publication August 30, 1999.
*505 Peter W. Cravens, Livonia, for Police Officers Association of Michigan and Command Officers Association of Michigan.
Hankins & Flanigan, P.C. (by Dan E. Hankins ), Okemos, for Fraternal Order of Police, Montcalm County Lodge No. 149 (Montcalm County Sheriff Department Division).
Varnum, Riddering, Schmidt & Howlett LLP (by John Patrick White and Anthony R. Comden), Grand Rapids, for Montcalm County and Montcalm County Sheriff.
Before: SAWYER, P.J., and MURPHY and TALBOT, JJ.
SAWYER, P.J.
In Docket Nos. 202793 and 202794, the incumbent union, Fraternal Order of Police, Montcalm County Lodge No. 149(FOP), appeals, and Montcalm County cross appeals, from a decision of the Michigan Employment Relations Commission directing elections to be held among certain employees of the Montcalm County Sheriff's Department to determine whether those employees wish to form separate *506 bargaining units, one to be represented by the Police Officers Association of Michigan (POAM) and the second by the Command Officers Association of Michigan (COAM). In Docket No. 210068, Montcalm County and the Montcalm County Sheriff appeal from a MERC determination that they had engaged in an unfair labor practice by refusing to bargain with the POAM and the COAM while the appeal by the FOP in Docket Nos. 202793 and 202794 was pending. We affirm.
For approximately twenty-five years, the FOP has been the single bargaining unit representing the employees of the Montcalm County Sheriff's Department. Within the bargaining unit were road patrol deputies, the road patrol sergeants, emergency dispatch officers, corrections officers, and corrections sergeants. The MERC determined that those employees eligible for compulsory arbitration under 1969 PA 312, M.C.L. § 423.231; MSA 17.455(31) (Act 312 employees), which the MERC determined consisted of the patrol deputies, emergency dispatch officers, and the road patrol sergeants and lieutenants, should have a bargaining unit separate from that of the non-Act 312 employees, the corrections officers and corrections sergeants. The MERC further determined that it would be appropriate for the supervisory officers, road patrol sergeants and lieutenants, to have a bargaining unit separate from that of the patrol deputies and emergency dispatch officers.[1] The MERC's decision reflects that it has long been the MERC's position that Act 312 employees should be in bargaining units separate from those of non-Act 312 employees. However, the MERC has also taken the position that it would not require separation in existing bargaining units containing both Act 312 and non-Act 312 employees and, therefore, would allow those employees to vote to remain part of the same bargaining unit.
Thus, the MERC's opinion directed an election among two units:
Unit I: (Case No. R96 J-160)
All permanent, full time nonsupervisory employees of the Sheriff's Department of the County of Montcalm who are eligible for arbitration under 1969 PA 312, including the positions of deputy and emergency communications operator; but excluding corrections officers, the Sheriff, Undersheriff, and all other employees.
The above-described employees shall vote pursuant to the attached Directions of Election whether they wish to be represented for purposes of collective bargaining by the Police Officers Association of Michigan or by the Fraternal Order of Police, Montcalm County Lodge No. 149. A vote for the Police Officers Association of Michigan shall indicate a desire to be represented by this labor organization as a separate unit. A vote for the Fraternal Order of Police, Montcalm County Lodge No. 149 shall indicate a desire to remain represented by this labor organization as part of a unit also including nonsupervisory corrections officers.
Unit II: (Case No. R96 J-159)
All permanent, full time supervisory employees of the Sheriff's Department of the County of Montcalm who are eligible for arbitration under 1969 PA 312, including the positions of lieutenant and road sergeant; but excluding the corrections officer sergeants, the Sheriff, Undersheriff and all other employees.
The above-described employees shall vote pursuant to the attached Directions of Election whether they wish to be represented for purposes of collective bargaining by the Command Officers *507 Association of Michigan or by the Fraternal Order of Police, Montcalm County Lodge No. 149. A vote for the Command Officers Association of Michigan shall indicate a desire to be represented by this labor organization as a separate unit. A vote for the Fraternal Order of Police, Montcalm County Lodge No. 149 shall indicate a desire to remain represented by this labor organization as part of a unit which also includes corrections sergeants.
Thus, depending on the outcome of those two elections, several different results could have been obtained:
1. All employees would remain represented by the FOP;
2. The supervisory employees would be represented by the COAM, the other employees would remain represented by the FOP;
3. The patrol deputies and emergency dispatch officers would be represented by the POAM, the other employees would remain represented by the FOP; and
4. The patrol deputies and emergency dispatch officers would be represented by the POAM, the supervisory employees would be represented by the COAM, and the other employees (corrections officers and corrections sergeants) would remain represented by the FOP.
Following the elections, option 4 above is what resulted.
The first issue, raised both by the incumbent union in its appeal and by the county in its cross appeal, is that the MERC erred in dividing the employees on the basis of their Act 312 status. We disagree.
The Supreme Court summarized the standard of review of MERC decisions in Grandville Municipal Executive Ass'n v. City of Grandville, 453 Mich. 428, 436, 553 N.W.2d 917 (1996):
The decisions of the MERC are reviewed on appeal pursuant to Const. 1963, art. 6, § 28, and M.C.L. § 423.216(e); MSA 17.455(16)(e). The commission's findings of fact are conclusive if they are supported by competent, material, and substantial evidence on the record considered as a whole. Port Huron Ed. Ass'n v. Port Huron Area School Dist., 452 Mich. 309, 322, 550 N.W.2d 228 (1996). The MERC's legal determinations may not be disturbed unless they violate a constitutional or statutory provision or they are based on a substantial and material error of law. MCL 24.306(1)(a), (f); MSA 3.560(206)(1)(a), (f). Id. at 323, 550 N.W.2d 228.
The determination of an appropriate bargaining unit is a question of fact. Police Officers Ass'n of Michigan v. Grosse Pointe Farms, 197 Mich.App. 730, 735, 496 N.W.2d 794 (1992).
As the MERC acknowledged in this case, the longstanding goal has been to form the largest possible bargaining unit with a community of interests. This principle was restated by this Court in Police Officers Ass'n of Michigan, supra at 736, 496 N.W.2d 794:
In designating appropriate bargaining units, the commission's primary objective is to constitute the largest unit that, under the circumstances of the case, would be most compatible with the effectuation of the purposes of the law and would include in a single unit all common interests. The touchstone of an appropriate bargaining unit is a common interest of all its members in the terms and conditions of their employment that warrants inclusions in a single bargaining unit and the choosing of a bargaining agent. A community of interests includes, among other considerations, similarities in duties, skills, working conditions, job classifications, employee benefits, and the amount of interchange or transfer of employees. [Citations omitted.]
*508 The question in the case at bar, which appears to be one of first impression, is whether the MERC erred in determining that Act 312 status creates different communities of interest between Act 312 employees and non-Act 312 employees such that each group should be represented by its own bargaining unit. We are not persuaded that the MERC erred.
The MERC's decision acknowledged that there are a number of factors that weigh in favor of finding a community of interest between the Act 312 employees and the non-Act 312 employees in the Montcalm County Sheriff's Department. However, the MERC decided that those factors were outweighed by the MERC's longstanding practice of separating Act 312 employees from non-Act 312 employees.
While we could debate whether access to compulsory arbitration is sufficient to create different communities of interest as compared to the other factors, it is neither necessary nor appropriate for us to do so. As noted above, the determination of an appropriate bargaining unit is a question of fact and we review questions of fact to determine if they are supported by competent, material, and substantial evidence on the whole record. In the case at bar, the record supports the MERC's application of its longstanding policy of separating bargaining units on the basis of Act 312 eligibility. Therefore, we will not disturb that finding.
Next, the incumbent union argues that the MERC erred in substituting a "community of remedies" test for the traditional "community of interests" test in determining the appropriate bargaining unit. We disagree. The MERC did not substitute tests; rather, it determined that the different remedies available to Act 312 employees and non-Act 312 employees are a consideration against finding a community of interests and that that consideration outweighs those considerations that favor finding a community of interests. Therefore, we are not persuaded that the MERC applied the wrong test.
The incumbent union's next argument is that the MERC erred in finding that the sergeants and lieutenants are supervisors. We disagree.
In Michigan Ed. Ass'n v. Clare-Gladwin Intermediate School Dist., 153 Mich.App. 792, 796-797, 396 N.W.2d 538 (1986), this Court discussed the meaning of the term "supervisor":
The term "supervisor" has not been defined under the Michigan labor mediation act nor is the term defined under the public employment relations act. Neither this Court nor our Supreme Court has imposed a judicial definition of "supervisor" or "supervisory" on the MERC or discussed the rationale behind segregating the bargaining units of supervisors from the bargaining units of other employees. Nonetheless, we need not address the MERC's ruling in a vacuum. When this Court encounters a void of Michigan precedent on a labor subject, it finds persuasive federal labor relations law. Bd. of Control of Ferris State College v. Michigan AFSCME, Council 25, 138 Mich.App. 170, 176, 361 N.W.2d 342 (1984).
The Congress recognized a need to segregate supervisors from other personnel because of its concern about unrestricted unionization of supervisors. Congress was concerned that fraternal union feelings would impair a supervisor's ability to apply his employer's policy to subordinates according to the employer's best interest. See NLRB v. Bell Aerospace Co., 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). It withdrew certain protections from "supervisory" employees in order to give employers more freedom to prevent a prounion bias from interfering with the independent judgment of employees holding supervisory positions. NLRB v. Pilot Freight Carriers, Inc., 558 F.2d 205 (C.A.4, 1977), cert den 434 U.S.

*509 1011, 98 S.Ct. 723, 54 L.Ed.2d 754 (1978).
"Supervisors" are defined in the Labor Management Relations Act, 29 U.S.C. 152(11):
"(11) The term `supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, layoff, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."
The federal courts have consistently held that 29 U.S.C. 152(11) is to be read in the disjunctive with the existence of any one of the statutory powers, regardless of the frequency of its exercise, being sufficient to confer supervisory status on the employee, as long as the existence of the power is real rather than theoretic. NLRB v. Pilot Freight Carriers, supra, at 207. Said another way, it is not the exercise of authority, but the delegation of authority, which is indicative of the attributes of a "supervisor."
In the case at bar, the MERC stated its conclusion that sergeants and lieutenants were supervisors as follows:
We conclude that the sergeants in this case are supervisors within the definition set out above. Both the road and corrections sergeants regularly assign and direct the work of deputies and corrections officers respectively. A road sergeant is assigned to every shift. Sergeants are generally the highest ranking officers on duty during the evening, night and on weekends. The record does not establish that the sergeants have the authority to effectively recommend the discharge or suspension of an employee. However, the record does establish that sergeants have the authority to issue lower level discipline, i.e., so-called verbal warnings or counselings which are placed in the employee's file, and written warnings. In City of Detroit (Department of Public Works), 1996 MERC Lab Op 282, we found the position of senior storekeeper to be supervisory based solely on their authority to discipline subordinates and their authority to assign and direct subordinates' work. In this case, the record also establishes that the sergeants have the authority to transfer employees from shift to shift and to approve or deny their leave requests. Finally, the sergeants have the authority to evaluate employees, and do in fact prepare written evaluations of probationary employees.
The position of lieutenant is a higher rank than sergeant. The lieutenants have formal supervisory authority over corrections officers and emergency communications operators as well as sergeants and deputies. The lieutenants are more involved in policy decisions than the sergeants. More detailed testimony was put on the record regarding the supervisory duties of the sergeants than that of the lieutenants. However, we find that the record justifies the assumption that the lieutenants have, at the least, all the authority possessed by the sergeants in this case. We concluded, therefore, that the lieutenants are also supervisors within the definition set out above.
Undersheriff William Barnwell testified that one or two road sergeants were assigned to every shift. According to the job description, all road sergeants had authority to direct the work force while on the road, and to supervise deputies engaged in criminal investigations, patrol areas, follow-ups, investigations, and assignments. Part of the duties of road patrol sergeants was to patrol like a deputy and they spent approximately seventy-five percent of their time patrolling, although it might be less on days when they had to perform administrative *510 assignments. However, sergeants had the authority to direct the work of deputies. At a crime scene, a road patrol sergeant would have authority to direct activities unless relieved by a higher officer. Moreover, because corrections sergeants did not work on weekends, corrections officers would report to a road sergeant if there was one on duty or otherwise contact the command officer on call with regard to questions that might arise.
Further, road patrol sergeants had the authority to make day-to-day adjustments in the schedule. They also had the right to transfer employees from shift to shift. They authorized vacation, personal, and compensatory leave time and participated in hiring by screening applicants, assisting in background investigations, and making recommendations. In addition, they had the authority to issue verbal warnings and written reprimands, to send a deputy home, and to recommend discharge or suspension. However, Undersheriff Barnwell could not recall an instance where a sergeant had issued a disciplinary suspension to a corrections officer or a road deputy during the past twenty-two years. He testified that perhaps fifteen to eighteen years ago a sergeant might have sent a deputy home from their particular shift. Moreover, he testified that the sheriff, "certainly, later on, would have the ultimate right to either agree or disagree with recommendations" regarding discipline. He did not know whether recommendations were typically followed but could not recall an instance where there was a disagreement between a sergeant and higher command over a decision to discharge. Under departmental policies, sergeants were supposed to prepare periodic written evaluations of deputies and of probationary employees. However, Barnwell testified that the department had been lax in preparing annual evaluations.
According to Barnwell, one lieutenant was assigned to the detective bureau and was frequently out on the road; the other lieutenant's main responsibilities involved road patrol. However, the two lieutenants, acting in a supervisory capacity, were generally responsible for directing road patrol, jail operations, and emergency communication officers. Also, lieutenants participated in making policy for the department although the sheriff ultimately had authority to approve any policy or procedure changes. Lieutenants were part of the hiring process and assisted in background investigations and in making recommendations. Similarly, lieutenants had authority to make recommendations on discharge decisions and were involved in evaluating sergeants, who in turn would evaluate deputies. Barnwell testified that recently the road lieutenant had prepared an evaluation for a promotional situation. Barnwell testified that neither sergeants nor lieutenants had the authority to lay off deputies for financial reasons or to recall employees who had been laid off, but that such a decision would be the responsibility of the sheriff and the board of commissioners.
On the basis of the above evidence, we are satisfied that the MERC's finding that the road sergeants and lieutenants were supervisory personnel was supported by competent, material, and substantial evidence on the whole record.
The incumbent union's next argument is that the MERC's decision is internally capricious because it would require that supervisory officers be segregated from the deputies in the new units while allowing supervisors and subordinates to be commingled in the old unit. It is true that the MERC's opinion allows for supervisory and nonsupervisory employees to remain in the existing bargaining unit, while they would not be commingled in the new units if the employees voted to separate. There is, however, a very logical explanation for this: the MERC was not called on to determine if the supervisory and nonsupervisory employees in the existing unit should be separated. They were asked to answer only two narrow questions: (1) should the patrol sergeants and *511 lieutenants be able to vote on forming their own separate bargaining unit and (2) should the patrol deputies and emergency dispatch officers be allowed to vote on forming their own separate bargaining unit. Because the MERC was not asked to separate the corrections sergeants from the corrections officers, the MERC properly did not address that issue.
Next, the incumbent union argues that the MERC erred in determining that the corrections officers were not Act 312 employees. Specifically, the incumbent union argues that the MERC erred in failing to consider the jail inmates as "members of the community" for purposes of deciding whether a "threat to community safety" existed in determining the eligibility of the corrections officers for Act 312 arbitration. We disagree.
In Capitol City Lodge No. 141, Fraternal Order of Police v. Ingham Co. Bd. of Comm'rs, 155 Mich.App. 116, 121, 399 N.W.2d 463 (1986), this Court reversed a determination by the MERC that Act 312 binding arbitration applied to jail security officers. The Court explained that Act 312 provided for compulsory, binding arbitration of labor disputes in public police and fire departments. Id. at 117-118, 399 N.W.2d 463. The Court cited the two conditions requisite to invocation of Act 312 that were set forth by a Supreme Court plurality in Metropolitan Council No. 23, AFSCME v. Oakland Co. (Prosecutor's Investigators), 409 Mich. 299, 335, 294 N.W.2d 578 (1980):
First, the particular complainant employee must be subject to the hazards of police work.... Second, the interested department/employer must be a critical-service county department engaging such complainant employees and having as its principal function the promotion of the public safety, order and welfare so that a work stoppage in that department would threaten community safety. [Capitol City Lodge, supra at 118, 399 N.W.2d 463.]
The Court found that the record disclosed an absence of competent, material, and substantial evidence supporting a finding that the second prong of the test had been satisfied. Id. at 119, 399 N.W.2d 463. The Court stated that on the basis of the plurality opinion in Metropolitan Council and Justice Ryan's concurring opinion, "a finding that a strike would threaten public safety was a prerequisite to Act 312 coverage." Id. at 120, 399 N.W.2d 463.
In the case at bar, the MERC found in part as follows:
In Capitol City Lodge ... the Court of Appeals interpreted Oakland County Prosecutor to mean that if the employer testified that it could temporarily replace its corrections officers with road patrol or supervisory employers, or permanently replace some corrections officers, or transfer its prisoners, or take other measure [sic] to keep the jail functioning in the event of a strike by corrections officers, such a strike would not pose a threat to community safety, and the second arm of the Oakland County Prosecutor test would not be met.
Although the Montcalm County Sheriff's Department does not have a formal plan for dealing with a possible strike by its corrections officers, the undersheriff described what steps the department would take in the event of such a strike. He stated that he believed that the department could do all that was necessary to keep the jail open and that the public safety would not be threatened. Under current law, as embodied by Ingham County, this evidence is sufficient to establish that corrections officers employed by Montcalm County are not eligible for arbitration under Act 312.
Although corrections officers do some emergency dispatch, principally assisting dispatchers on the evening shift, the record does not indicate that emergency dispatch is a "significant" or "regular" part of their job. Village of New Haven, 1988 MERC Lab Op 601, 602-603. The evidence does not warrant finding *512 the corrections officers to be dual function employees eligible for Act 312 arbitration because of their dispatcher duties.
Undersheriff Barnwell testified that should a work stoppage occur among corrections officers, although there was no written plan, the sheriff, who had the duty to run the jail, would have to find adequate people to fill the positions and would have to consider all options, such as using road officers, extending shifts, transferring prisoners, and hiring replacements. Barnwell believed that the various options could be used in such a way that the public safety would not be endangered. According to Barnwell, corrections officers were not required by law to be certified and the only prerequisite for hiring was a high school education. However, corrections officers were required by the employer, as part of ongoing training, to attend a four-week training course for corrections officers conducted by the Department of Corrections.
Furthermore, we are not persuaded by the incumbent union's argument that the MERC's decision was defective for failing to consider the safety of the inmates as part of the public safety analysis. First, the fact that the MERC's opinion did not specifically address the inmates does not mean that the MERC did not consider them as part of the public. Second, even if the MERC did not consider the inmates in its public safety analysis and should have, the facts do not support a finding that the safety of the inmates would necessarily be endangered in the event of a strike by the corrections officers.
As noted above, in the event of a strike by the corrections officers, the sheriff has a number of options to deal with the situation, none of which require the endangerment of the prisoners. There are two in particular that we would like to note, because they are in contrast to the situation that would exist if patrol deputies were to strike. First, replacing corrections officers is easier because of the requirement for the deputies to be certified by the Council on Law Enforcement Standards. See M.C.L. § 28.609(2); MSA 4.450(9)(2) (law enforcement officers hired after January 1, 1977, must be certified). Thus, not only could the corrections officers be replaced, deputies could be moved into the jail in the event of a strike by corrections officers. However, corrections officers could not be moved onto road patrol in the event of a strike by deputies. Second, the sheriff could transfer prisoners to other county jails. That is, if the sheriff determined that he could not safely operate the jail, including considerations of prisoner safety, in the event of a strike by corrections officers, he could make arrangements to house prisoners in other counties. On the other hand, in the event of a strike by deputies, the Sheriff could not likely persuade criminals to cease from committing offenses within the county and motorists to forgo traffic accidents in the county until the strike was settled.
For the above reasons, we are not persuaded that the MERC erred in determining that Act 312 applied to the deputies and emergency dispatch officers, while it did not apply to the corrections officers.
Finally, we turn to the issue raised by the county and the sheriff in Docket No. 210068, namely, whether they had an obligation to bargain with the newly certified unions while the incumbent union appealed in this Court the MERC's ruling to hold the election that lead to the certification of the new unions.
In pursuing this appeal, the FOP requested both the MERC and this Court to stay the MERC's decision to hold certification elections. Both the MERC and this Court denied those motions to stay. The certification elections were held, and the MERC certified the POAM as the bargaining unit for the patrol deputies and the COAM as the bargaining unit for the road sergeants and lieutenants. The county refused to bargain with the POAM and the COAM on the grounds that the FOP was challenging the representational status in *513 this Court and that the county had no duty to bargain with the POAM or the COAM until the appeal was decided.
The POAM and the COAM filed an unfair labor practice charge, and arguments were presented to the hearing referee. The referee recommended that the county be ordered to bargain with the POAM and the COAM and that the POAM and the COAM be certified for one year. The MERC adopted the referee's recommendations.
The MERC did not err in finding that the county was required to negotiate with the POAM and the COAM. Section 23, subdivision e, of the labor mediation act grants an aggrieved party the right to appeal a MERC decision to this Court. MCL 423.23(e); MSA 17.454(25)(e). The appeals pending before this Court were filed pursuant to that statutory provision. Section 23 also states: "The commencement of proceedings under subdivision (d) or (e), shall not, unless specifically ordered by the court, operate as a stay of the commission's order." MCL 423.23(f); MSA 17.454(25)(f). This Court considered a motion for stay of the MERC's order and denied that motion. The plain language of the statute, M.C.L. § 423.23(f); MSA 17.454(25)(f), indicates that the MERC's decisions in this matter remain valid throughout the pendency of the appeal; that is, the pending appeal "shall not... operate as a stay of the commission's order[s]." Id.
The elections granted by the MERC's April 9, 1997, order certified the POAM and the COAM as representing certain sheriff's department employees. A stay was not granted. Therefore, the MERC was within its statutory authority to adopt the POAM and the COAM as representatives of the specified employees. Consequently, the POAM and the COAM were authorized to request bargaining and to charge the county with unfair labor practices when it refused to enter into collective bargaining. MCL 423.210(1)(e); MSA 17.455(10)(1)(e). Because there were no factual issues in dispute, the MERC properly found that the county had engaged in unfair labor practices.
The county's argument that if it were forced to negotiate with the POAM and the COAM and this Court were to reverse the MERC's decision and rule that the FOP should not have been removed as the bargaining agent, then the county would be subject to an unfair labor practice charge by the FOP. We disagree. Such a claim by the FOP would be meritless. Although the representational status of the POAM and the COAM has been questioned and has been appealed to this Court, the denial of the motion to stay requires that the POAM and the COAM be recognized as the employees' representatives. In short, because the county was obligated to negotiate with the POAM and the COAM, they could not be guilty of an unfair labor practice with respect to the FOP.
Affirmed. The POAM and the COAM may tax costs.
NOTES
[1] Specifically, the POAM had petitioned the MERC to separate the patrol deputies and emergency dispatch officers from the existing bargaining unit. At the same time, the COAM petitioned to separate the patrol sergeants and lieutenants from the existing bargaining unit. The county and the sheriff took the position that the patrol deputies should not be separate from the existing unit, but that the patrol sergeants and lieutenants should be.