OAKLAND COUNTY v OAKLAND COUNTY DEPUTY
SHERIFF'S ASSOCIATION

Docket No. 280075. Submitted November 13, 2008, at Detroit. Decided
    February 3, 2009, at 9:05 a.m. Leave to appeal sought.
    The Oakland County Deputy Sheriff's Association, a union, filed an
    unfair-labor-practice charge with the Michigan Employment Re-
    lations Commission. The union also petitioned for compulsory
    arbitration under 1969 PA 312, MCL 423.231 *et seq.* (Act 312), for
    uniformed Oakland County Sheriff's Department employees below
    a certain rank. Asserting that some classes of employees were
    ineligible for Act 312 arbitration, the respondents, Oakland
    County and the Oakland County Sheriff's Department, moved to
    dismiss the petition for arbitration or to clarify the existing
    bargaining unit and declare some groups of employees ineligible.
    The commission granted the respondents' motion in part and
    severed the union into separate bargaining units, only one of
    which was eligible under Act 312. The ineligible unit included
    corrections officers. The union appealed.

    The Court of Appeals *held*:

    1. An employer may seek severance of a mixed bargaining unit,
    even in the absence of a request by an employee to do so. An
    employer has the same right under the act to raise a representa-
    tion issue as an employee or a labor organization acting on the
    employee's behalf. Act 312 is intended to protect both employers
    and employees. The commission provided factual support for its
    conclusion that severance was appropriate under the circum-
    stances of this case, given that the parties had been operating
    without a collective bargaining agreement since 2003 and the
    bargaining process had been hindered by the parties' inability to
    resolve the dispute-resolution mechanism applicable to a majority
    of the employees. The commission's decision was neither arbitrary
    nor capricious, and it was supported by competent, material, and
    substantial evidence on the whole record.

    2. The hearing referee did not abuse his discretion by failing to
    hold an evidentiary hearing to establish the classes of employees
    eligible for Act 312 arbitration. He gave the union several oppor-

tunities to show the existence of disputed factual issues that
required an evidentiary hearing, but the union did not do so.

3. The commission had authority under its rules to require the
briefing of issues, to treat an issue under Act 312 as one involving
an action to clarify bargaining units, and to enter the dismissal
order.

Affirmed.

O'CONNELL, J., dissenting, stated that the commission improp-
erly denied the union its opportunity to have an evidentiary
hearing regarding whether certain sheriff's department employ-
ees, including corrections officers, are eligible for Act 312 arbitra-
tion. One element of the test to determine whether members of a
bargaining unit are entitled to Act 312 arbitration requires that
they be employees of a critical-service department promoting
public safety, order, and welfare, so that a work stoppage by those
employees would threaten community safety. The commission
should employ a totality-of-the-circumstances test and consider a
number of factors to determine whether a strike by corrections
officers would threaten community safety. The commission's deci-
sion should be vacated, and the case remanded for an evidentiary
hearing on that issue.

LABOR RELATIONS — PUBLIC EMPLOYEES — ARBITRATION — COLLECTIVE BARGAIN-
ING.

An employer may seek severance of a mixed collective bargaining
unit in a matter before the Michigan Employment Relations
Commission under MCL 423.231 *et seq.*, even in the absence of a
request by an employee to do so.

*Butzel Long* (by *Malcolm D. Brown*) for Oakland
County and the Oakland County Sheriff's Department.

*Webb, Engelhardt and Fernandes* (by *L. Rodger
Webb*) for the Oakland County Deputy Sheriff's Asso-
ciation.

Before: JANSEN, P.J., and O'CONNELL and OWENS, JJ.

JANSEN, P.J. Charging party, the Oakland County
Deputy Sheriff's Association (the union), appeals by
right the decision and order of the Michigan Employ-
ment Relations Commission (MERC), which dismissed

in part the union's petition for binding arbitration under 1969 PA 312, MCL 423.231 *et seq.* (commonly referred to as "Act 312"), and severed the union's existing bargaining unit into two units—one consisting of employees eligible for Act 312 arbitration and the other consisting of employees not eligible for Act 312 arbitration. We affirm.

The union represents a bargaining unit of approximately 750 uniformed employees of respondent Oakland County Sheriff's Department. In August 2006, the union filed an unfair-labor-practice charge against the Sheriff's Department and a petition seeking Act 312 compulsory arbitration for "all sworn sheriff's department employees below the rank of sergeant." Respondents, Oakland County and the Oakland County Sheriff's Department, moved to dismiss the petition for arbitration, alleging that several classes of employees were ineligible for Act 312 arbitration, or to clarify the existing bargaining unit and declare certain groups of employees ineligible for arbitration.[1] The MERC granted respondents' motion to dismiss in part and severed the union into two separate bargaining units— namely (1) a unit consisting of all employees eligible under Act 312, consisting of "all positions previously

---

[1] The public employment relations act (PERA), MCL 423.201 *et seq.*, prohibits public employees from striking. MCL 423.202. " '[A]s a necessary tradeoff for the prohibition against striking' " in police and fire disputes, the Legislature enacted 1969 PA 312, MCL 423.231 *et seq.*, which provides for compulsory arbitration for labor disputes in police and fire departments. *Jackson Fire Fighters Ass'n, Local 1306 v City of Jackson (On Remand)*, 227 Mich App 520, 523; 575 NW2d 823 (1998) (citation omitted). Only certain employees are eligible for arbitration under Act 312, specifically, "employees engaged as policemen, or in fire fighting or subject to the hazards thereof, emergency medical service personnel employed by a police or fire department, or an emergency telephone operator employed by a police or fire department." MCL 423.232(1).

within the bargaining unit that are assigned to the Patrol Services Division (including the complex control [sic] assignments), or assigned to the Investigative and Forensic Services Division (excluding forensic laboratory specialists), and require [certification under the Commission on Law Enforcement Standards Act] or are assigned to positions as dispatchers" and (2) a unit consisting of "all positions previously within the bargaining unit that are assigned to the Corrections Division or to circuit court investigator or forensic laboratory specialist positions."

In *Branch Co Bd of Comm'rs v Int'l Union, United Automobile, Aerospace & Agriculture Implement Workers of America*, 260 Mich App 189, 192-193; 677 NW2d 333 (2003), this Court set forth the standard that governs our review of MERC decisions:

> We review MERC decisions pursuant to Const 1963, art 6, § 28, and MCL 423.216(e). MERC's findings of fact are conclusive if they are supported by competent, material, and substantial evidence on the record considered as a whole. MERC's legal determinations may not be disturbed unless they violate a constitutional or statutory provision or they are based on a substantial and material error of law. In contrast to . . . MERC's factual findings, its legal rulings are afforded a lesser degree of deference because review of legal questions remains de novo, even in MERC cases. [Citations and quotation marks omitted.]

The union argues that there was no legal or factual reason for the MERC to sever the bargaining unit for the benefit of the employer and that severance improperly served only to punish the union for filing the unfair labor practice charges. We disagree.

Although less deference is afforded an agency's legal conclusions, appellate courts traditionally have acknowledged " 'the MERC's expertise and judgment in the area of labor relations.' " *Port Huron Ed Ass'n v*

*Port Huron Area School Dist*, 452 Mich 309, 323 n 18; 550 NW2d 228 (1996) (citation omitted). Further, a determination of the appropriate bargaining unit " 'is a finding of fact, not to be overturned . . . if it is supported by competent, material and substantial evidence.' " *Mich Ed Ass'n v Alpena Community College*, 457 Mich 300, 307; 577 NW2d 457 (1998) (citation omitted); see also *Police Officers Ass'n of Michigan v Grosse Pointe Farms*, 197 Mich App 730, 735; 496 NW2d 794 (1993).

As an initial matter, we find no error in the MERC's legal determination that an employer is permitted to seek severance of a mixed bargaining unit, even in the absence of a request by an employee. Although the MERC recognized the general policy against disturbing existing bargaining units and acknowledged that severance at the request of an employer had not previously been considered, it also noted that it had not been rejected either. In any event, the MERC is permitted to reexamine prior decisions, depart from precedents, promulgate law though rulemaking, break from past decisions, or reconsider previously established rules. *Melvindale-Northern Allen Park Federation of Teachers, Local 1051 v Melvindale-Northern Allen Park Pub Schools (After Remand)*, 216 Mich App 31, 37-38; 549 NW2d 6 (1996). "If the departure from precedent is explained, appellate review is limited to whether the rationale is so unreasonable as to be arbitrary and capricious." *Id.* at 38.

As the MERC observed, an employer has the same statutory right to raise a representation issue as an employee or a labor organization acting on the employee's behalf. See MCL 423.212. The MERC also properly observed that Act 312 is intended to protect both employers and employees. The union did not identify below, and has not identified on appeal, any law prohib-

iting an employer from seeking severance of a mixed bargaining unit. Against this backdrop, the MERC concluded that there was

> no basis under PERA or under Act 312 to hold that a covered employer may never seek severance of a mixed bargaining unit, where the circumstances make severance appropriate. It is the employer that is principally burdened by Act 312, by having its ordinary prerogatives truncated. . . . There is no logical basis for precluding an employer from seeking clarification of a unit's coverage by Act 312, where the statutory structure expressly allows that same employer to petition for arbitration under the Act in precisely the same fashion as a union may initiate proceedings.

Additionally, although the MERC acknowledged its past practice of avoiding severance of preexisting mixed units, it stated that this practice should not be inflexibly applied:

> We must have always foremost in mind our obligation to "decide in each case, to insure public employees the full benefit of their right to self-organization, to collective bargaining and to otherwise effectuate the purposes of this act, the unit appropriate for the purpose of collective bargaining" taking into account the need to define a unit which "will best secure to the employees their right of collective bargaining." MCL 423.213 and 423.9e. Here, we find that the existing mixed unit is not effectuating the purposes of the Act; to the contrary, the continued existence of this mixed unit has interfered in the normal and healthy give and take of bargaining anticipated under PERA and under Act 312.

The union has not shown that MERC's decision to sever its bargaining unit violated any constitutional or statutory provision or that the decision was based on a substantial and material error of law. Further, contrary to the union's argument, the MERC provided factual

support for its conclusion that severance was appropriate under the circumstances of this case. As the MERC explained, the

> parties' collective bargaining agreement expired in 2003. This has left the parties frozen in place, with no immediate mechanism for adjusting conditions of employment. By a significant margin, the majority of the existing bargaining unit are in job categories not covered by Act 312. The Act 312 arbitration petition seeks to have an arbitrator set conditions of employment for County road patrol officers and for over 400 employees who clearly function as jail guards. The bargaining process itself has been skewed by the inability of the parties to agree, or otherwise resolve, which groups of employees are covered by which dispute resolution mechanism. The intractable nature of the dispute between the parties was evidenced by the filing of an extraordinary number of unfair labor practice charges.
>
> Severing the existing unit results in one Act 312 covered unit of nearly 350 employees and a non-Act 312 unit of over 400 employees. Both resulting units are large by comparison with other public employee bargaining units and would clearly be of sufficient size to effectively engage in collective bargaining with the Employer over issues peculiar to their respective unit members. The two separate units may continue to be represented by the Union, which will act separately on behalf of each unit. The Employer will be able to bargain separate agreements with the two units without having issues that should properly be limited to one group impinging on negotiations involving the other. Therefore, we find it appropriate to direct the severing of the existing unit in order to foster more productive bargaining and to thereby effectuate the purposes of the Act.

We find no support in the record for the union's assertion that the MERC punished it for filing unfair labor practice charges. Rather, the MERC observed that the parties had been operating without a collective bargaining agreement since 2003 and that the bargain-

ing process had been hindered because of disagreement over the appropriate dispute resolution mechanism applicable to a majority of the employees. The MERC's severance decision was intended to foster more productive bargaining for all affected employees, all of whom would still be represented by the union. The MERC's decision was neither arbitrary nor capricious, and it was supported by competent, material, and substantial evidence on the whole record.

Nor do we find merit to the union's argument that the proceedings below were procedurally flawed. The union argues that it was entitled to an evidentiary hearing before a hearing referee to allow it to establish that various classes of employees qualified for Act 312 arbitration. The decision whether to hold an evidentiary hearing is within the discretion of the MERC. *Sault Ste Marie Area Pub Schools v Michigan Ed Ass'n*, 213 Mich App 176, 182; 539 NW2d 565 (1995).

The referee who was assigned to this matter originally scheduled an evidentiary hearing, recognizing that the parties were disputing whether certain classes of employees were eligible for Act 312 arbitration and that an evidentiary hearing would likely be necessary to resolve the disputed issues of fact. The referee issued a pretrial order directing the parties to, among other things, provide specific information regarding the disputed factual issues. The union responded by filing a brief that listed a number of areas in which it intended to present proofs, but did not state what the proofs would show. Further, it did not even discuss several positions that respondents had asserted were not eligible for Act 312 arbitration, such as positions in the crime lab, circuit court investigators, circuit and district court staff, and complex patrol officers. The referee found that the union's brief had failed to comply with

the pretrial order, but agreed to give the union additional time to file a conforming supplemental brief. The referee also issued a supplemental pretrial order directing the union to substantively address its claim that the Oakland County Sheriff's Department was "factually unique," to identify any material disputes of fact regarding each of the contested employee groups,[2] and to list and address any material disputes of fact regarding the appropriate treatment of each classification under Act 312, including specific offers of proof. Despite being granted this extension, the union failed to timely submit a supplemental brief. Consequently, the referee granted respondents' petition to dismiss the issue of Act 312 arbitration with respect to employees working in the crime lab, in the circuit and district courts, and as circuit court investigators. However, the referee declined to dismiss the petition with respect to officers assigned to complex patrol and granted oral argument for further consideration of that issue.[3] A week later, the union filed a supplemental brief and a motion for reconsideration, but the referee declined to grant reconsideration because the supplemental brief still failed to establish the existence of a material factual dispute.

The union was given several opportunities to show the existence of disputed factual issues that required an evidentiary hearing, but repeatedly failed to do so. Under these circumstances, the referee did not abuse his discretion by failing to hold an evidentiary hearing. See *Swickard v Wayne Co Med Examiner*, 184 Mich App 662, 668; 459 NW2d 92 (1990) (observing that "since

---

[2] These groups specifically consisted of the corrections division, crime lab employees, circuit court investigators, circuit court and district court staff, and complex patrol officers.

[3] Respondents later conceded that complex patrol officers were eligible for arbitration under Act 312.

there were no disputed issues of fact, an evidentiary hearing would have served no purpose").

The union also challenges the referee's authority to order briefing, to "morph" an Act 312 issue into a unit clarification action, and to enter an order of dismissal. However, the MERC rules clearly provide authority for these matters. See Mich Admin Code, R 423.173 (providing that a referee "may direct the filing of briefs when the filing is, in the opinion of the commission or administrative law judge, warranted by the nature of the proceedings or the particular issues involved"); Mich Admin Code, R 423.172(2) (permitting a referee to hold pretrial conferences, dispose of motions, regulate the course of the hearing, and take other actions as necessary and authorized by the rules); Mich Admin Code, R 423.165(1) (stating that the "commission or administrative law judge designated by the commission may, on its own motion or on a motion by any party, order dismissal of a charge").

The union also claims that the hearing referee mischaracterized the facts. The union, however, advised the referee that there were no "significant issues of fact" and failed to take advantage of several opportunities to present offers of proof and to identify disputed issues of fact. The union's refusal to brief below the factual disputes that it now asserts on appeal precludes appellate relief. See *Czymbor's Timber, Inc v City of Saginaw*, 269 Mich App 551, 556; 711 NW2d 442 (2006), aff'd 478 Mich 348 (2007); see also *Blazer Foods, Inc v Restaurant Properties, Inc*, 259 Mich App 241, 252; 673 NW2d 805 (2003).

Finally, the union argues that the MERC erroneously construed MCL 423.232(1) by concluding that the statutory language "or subject to the hazards thereof" modifies only the phrase "engaged . . . in fire fighting"

and does not modify the phrase "engaged as policemen." We find it unnecessary to resolve this issue of statutory construction because it is not necessary to the outcome of this case. However, even assuming arguendo that the language "subject to the hazards thereof" could be construed as modifying the phrase "engaged as policemen" in MCL 423.232(1), it is well settled that county corrections officers and other employees who are not police officers are not subject to the hazards of police work. *Police Officers Ass'n of Michigan v Fraternal Order of Police, Montcalm Co Lodge No 149*, 235 Mich App 580, 593-596; 599 NW2d 504 (1999); *Capital City Lodge No 141, Fraternal Order of Police v Ingham Co Bd of Comm'rs*, 155 Mich App 116, 118-119; 399 NW2d 463 (1986); *Local No 214, Teamsters v Detroit (On Remand)*, 103 Mich App 782; 303 NW2d 892 (1981). Moreover, as discussed previously, the union was given an opportunity to demonstrate why its corrections officers and other employees who were not police officers were factually unique, such that they might be entitled to coverage under the language "subject to the hazards thereof." Nonetheless, the union failed to do so. In other words, even if some police employees who are not actually police officers might potentially qualify for coverage under Act 312, the union failed to establish a factual issue with respect to whether its corrections officers could so qualify in this case.

Affirmed.

OWENS, J., concurred.

O'CONNELL, J. (*dissenting*). I respectfully dissent. The central issue in this case requires this Court to decide whether Oakland County corrections officers, as well as others employed by the Oakland County Sheriff's Department, are entitled to an evidentiary hearing to

determine whether they are eligible for arbitration pursuant to what is commonly known as Act 312, the act providing for compulsory arbitration of labor disputes in police and fire departments, MCL 423.231 *et seq.* In my view, the Michigan Employment Relations Commission (MERC) improperly denied the Oakland County Deputy Sheriff's Association (the union) its opportunity to have an evidentiary hearing on this important issue, particularly with regard to the status of the corrections officers. I would vacate the MERC's decision and remand this case to the administrative hearing officer for an evidentiary hearing.[1]

Public employees are prohibited by statute from striking. MCL 423.202. However, in passing Act 312, the Legislature provided that "public police and fire departments" could enter into compulsory, binding arbitration to settle labor disputes.[2] *Capitol City Lodge No*

---

[1] Initially, I wish to emphasize that this case concerns whether a work stoppage by corrections officers would threaten community safety. To my knowledge, neither the MERC nor any court has addressed the issue in its proper framework. I would instruct the hearing officer to determine, on the basis of the totality of the circumstances, whether a work stoppage by the corrections officers represented by the union would threaten public safety. At the hearing, the hearing officer need not and should not focus on the issue of replaceability. Instead, the hearing officer should address the central issue of this case, namely, whether a work stoppage by corrections officers threatens community safety. In my opinion, whether ameliorative actions by the employer can be taken to reduce the threat is irrelevant.

[2] In MCL 423.231, the Legislature identified its reasons for providing compulsory arbitration of labor disputes in police and fire departments:

It is the public policy of this state that in public police and fire departments, where the right of employees to strike is by law prohibited, it is requisite to the high morale of such employees and the efficient operation of such departments to afford an alternate, expeditious, effective and binding procedure for the resolution of disputes, and to that end the provisions of this act, providing for compulsory arbitration, shall be liberally construed.

*141, Fraternal Order of Police v Ingham Co Bd of Comm'rs*, 155 Mich App 116, 117-118; 399 NW2d 463 (1986). "Public police and fire departments" that are eligible for Act 312 arbitration include "any department of a city, county, village, or township having employees engaged as policemen, or in fire fighting or subject to the hazards thereof...." MCL 423.232(1). Act 312 "reflects the Legislature's concern that employees of public police and fire departments, who provide vital services to their communities and who are prohibited by law from striking, have a binding procedure for resolving labor disputes which is more expeditious, more effective and less expensive than courts." *Capitol City Lodge*, 155 Mich App at 118.

In *Metro Council No 23, AFSCME v Oakland Co Prosecutor*, 409 Mich 299, 335; 294 NW2d 578 (1980), a plurality of our Supreme Court set forth two conditions that a union must establish before it is eligible for Act 312 arbitration:

> First, the particular complainant employee must be subject to the hazards of police work.... Second, the interested department/employer must be a critical-service county department engaging such complainant employees and having as its principal function the promotion of the public safety, order and welfare so that a work stoppage in that department would threaten community safety....

Although *Metro Council No 23* provided direction, MERC panels still weighed the duties and responsibilities of corrections officers represented by different bargaining units to determine whether the circumstances of their employment indicated that they were entitled to Act 312 arbitration. And, in particular, MERC rulings issued before 1986 indicated that corrections officers employed by a county sheriff's department were eligible for Act 312 arbitration.

The MERC panel in *Washtenaw Co Sheriff's Dep't v Teamsters Local 214*, 1979 MERC Lab Op 671, 677, had determined before *Metro Council No 23* was issued that corrections officers who performed standard security duties, as well as corrections officers working as cooks and nurses in the jail, "performe[d] a security-type function" and were exposed to the hazards of police work; therefore, they were eligible for Act 312 arbitration. The MERC panel in *Bay Co v Bay Co Sheriff's Deputies Ass'n*, 1985 MERC Lab Op 377, applied the two-part test presented in *Metro Council No 23* to determine that corrections officers employed by the Bay County Sheriff's Department were eligible for Act 312 arbitration. First, the panel determined that the correctional facility officers (CFOs) working at the Bay County jail were exposed "to risks substantially similar to those of sworn police officers so that the CFOs should be deemed to be subject to the hazards of police work." *Id.* at 383. The panel then addressed the second part of the *Metro Council No 23* test, explaining that the

> second part of the test . . . pertains not to the employee himself, but to his employer. That is, according to the Supreme Court, the employee must not only be an employee "subject to the hazards of police work," but also must be employed by a "critical service police department (or fire department) having as its principal function the promotion of the public safety, order and welfare so that a work stoppage in that department would threaten community safety." . . . [T]here is no question that the Bay County Sheriff's Department, the department/employer of the CFOs in this case, meets the definition of a "critical service police department."

> As our cases subsequent to that decision have indicated, [*Metro Council No 23*] holds that both the employee and the employing department must have "critical service status" in order to effectuate Act 312's intent as (1) requisite to the high morale of (the department); (2)

requisite to the efficient operation of (the department); or (3) necessary for averting critical service strikes which would likely impede the public safety, order and welfare. In this regard, we believe that it is clear from this record that the functions performed by the CFOs at the Bay County jail are essential to the public safety, order and welfare of the County. Moreover, regardless of what arrangements might be made for employee replacement or transfer of prisoners in the event of a strike, a strike or unresolved labor dispute involving these employees would, we believe, clearly undermine the morale and efficient operation of the Bay County Sheriff's Department. Thus we conclude that the inclusion of the CFOs in this case within the scope of Act 312 would be in accord with the intent of and would further the purposes of the Act.

In making Act 312 applicable not only to police officers and firefighters, but also employees of police departments "subject to the hazards" of police officers, the legislature clearly did not intend to limit the coverage of this Act only to sworn and certified police officers and firefighters. As the CFOs in this case are critical service employees subject to the hazards of police work and employed by a police department within the meaning of that statute, we find they are covered by the provisions. [*Id.* at 383-384.]

The *Bay Co* panel properly applied the requirements that the *Metro Council No 23* Court placed on it to determine if an employee's "critical service status" would cause a threat to community safety if that employee went on strike, taking a holistic view of the effect of a strike on community safety rather than making this determination on the basis of one factor.

However, in *Capitol City Lodge*, 155 Mich App at 119, this Court challenged the MERC's understanding that corrections officers could be eligible for Act 312 arbitration, holding instead that even if corrections officers at the Ingham County jail were subject to the hazards of police work, insufficient evidence supported a finding that a work stoppage at the jail would threaten commu-

nity safety. Notably, though, the *Capitol City Lodge* Court did not simply claim that the MERC panel in that case had made an evidentiary holding regarding whether a threat to community safety occurred. Instead, the Court recognized that "the commission did not discuss whether a strike by jail security officers would threaten community safety." *Id.* at 120. Yet, rather than remand the case to the MERC for an evidentiary hearing to determine if a strike by the corrections officers would pose a threat to community safety, the *Capitol City Lodge* Court made an independent factual decision, without the benefit of a complete lower court record, that such a strike would not threaten community safety. *Id.* at 120-121. In particular, the Court noted that the sheriff and the undersheriff of Ingham County had testified that they had a plan[3] to staff the jail in the event of a strike by the jail security officers and opined that, under these circumstances, such a strike would pose no threat to community safety. *Id.* at 120. Relying on these statements and other information in the record, the *Capitol City Lodge* Court determined that in the event of a strike, the sheriff could take law enforcement officers and command officers from road patrol and other assignments to assume the duties of the striking jail security officers and could transfer inmates to other jails. *Id.* at 120-121. In addition, the Court noted, the sheriff would be able to hire "adequate replacements for striking jail security

---

[3] I note that the fact that the sheriff has a plan, whether written or unwritten, to replace striking corrections officers does not in and of itself answer the question whether such a strike would threaten community safety. A deeper examination of the plan is necessary. I am reminded of the old saying: The best-laid plans of mice and men often go awry. It would be better, therefore, to ask whether community safety is threatened if corrections officers go on strike. When the question is asked in its proper framework, the answer appears to be self-evident.

officers, who are not required to be certified, . . . within three to five days." *Id.* at 120. Finally, after noting that the union did not present any contrary evidence and determining that the security guards could be replaced, the *Capitol City Lodge* Court concluded that a strike by the jail security guards would not threaten community safety. *Id.* at 121.

Although the *Capitol City Lodge* Court should not have even made these factual determinations, it was still a fact-based decision. It was not intended to be a blatant statement of the law, and it should not be treated as such. The *Capitol City Lodge* Court reached its conclusion without the benefit of either contrary evidence or any findings of fact and conclusions of law by a lower tribunal on this important topic. And, at most, *Capitol City Lodge* merely stands for the proposition that in that case, in light of the lack of specific facts presented to that MERC panel (and then to the *Capitol City Lodge* Court), the union failed to establish that a strike by its members would threaten community safety. The opinion does not stand, and never has stood, for the proposition that if an employee can be replaced, then no threat to community safety exists.[4] Instead, the second element of the *Metro Council No 23* test remains intact: members of a bargaining unit are only entitled to Act 312 arbitration if they are employees of a critical-service department promoting public safety, order, and welfare, so that a work stoppage by those employees would threaten community safety. The *Capitol City Lodge* Court merely considered whether the

---

[4] Such a conclusion would be equivalent to saying that if a police officer can be replaced, then a strike by the police would not be a threat to the safety of a community. Anyone can be replaced. Replacing a police officer with an unqualified individual, in my opinion, would pose a threat to the community.

corrections officers at the Ingham County jail were replaceable to determine whether this second element was established.[5]

Regardless, subsequent MERC panels treated the *Capitol City Lodge* opinion as a legal determination, holding that the opinion bound them to find that no threat to community safety existed as long as the striking corrections officers could be replaced.[6] See *Kent Co v Kent Co Deputy Sheriff's Ass'n*, 1991 MERC Lab Op 549, 554 ("As interpreted by the Court of Appeals [in *Capitol City Lodge*], the second part of the test turns on

---

[5] Unfortunately, in *Police Officers Ass'n of Michigan v Fraternal Order of Police, Montcalm Co Lodge No 149*, 235 Mich App 580; 599 NW2d 504 (1999) (*POAM*), this Court compounded the errors in *Capitol City Lodge* by adopting the *Capitol City Lodge* Court's line of reasoning. Regardless, the *POAM* Court addressed this issue in the context of responding to different appellate arguments than those raised in this case, namely, whether the commission "erred in failing to consider the jail inmates as 'members of the community' for purposes of deciding whether a 'threat to community safety' existed in determining the eligibility of the corrections officers for Act 312 arbitration" and whether the commission's "decision was defective for failing to consider the safety of the inmates as part of the public-safety analysis." *Id.* at 593, 595.

[6] In two MERC opinions issued soon after *Capitol City Lodge*, the MERC panels noted that the rationale in *Capitol City Lodge* regarding whether a strike by corrections officers constituted a threat to community safety diverged from the MERC panel's finding with regard to this issue in *Bay Co. Detroit v Michigan Fraternal Order of Police*, 1986 MERC Lab Op 966; *Detroit Police Dep't v Michigan Fraternal Order of Police*, 1986 MERC Lab Op 972. However, the MERC panels also noted that the parties did not contend that in the event of a strike, corrections officers could be adequately replaced without a threat to community safety and that the records in these cases provided no evidence to support a finding that the city could transfer adequate manpower from other public safety duties to man the jail or could swiftly hire adequate replacements. *Detroit*, 1986 MERC Lab Op at 969; *Detroit Police Dep't*, 1986 MERC Lab Op at 975. In both cases, the MERC panel concluded that "[i]n the absence of such evidence," the "fact that [corrections officers] are employed by a police department and perform a function essential to public safety is sufficient to establish their 'critical service' status." *Detroit Police Dep't*, 1986 MERC Lab Op at 975; see also *Detroit*, 1986 MERC Lab Op at 969.

whether or not striking employees could be replaced."). In *Washtenaw Co v Police Officers Ass'n of Michigan*, 1990 MERC Lab Op 768, 770, the county presented evidence indicating that the corrections officers could be replaced in the event of a strike.[7] Relying on *Capitol City Lodge* and another panel's decision in *Mecosta Co v Police Officers Ass'n of Michigan*, 1989 MERC Lab Op 607, the *Washtenaw Co* MERC panel concluded that the record did not "contain sufficient competent, material, or substantial evidence that a strike by the Washtenaw County correction officers would pose a threat to community safety" and determined that the corrections officers were not eligible for Act 312 arbitration. *Washtenaw Co*, 1990 MERC Lab Op at 772. In particular, the panel noted that the precedent established by those

---

[7] The MERC panel noted that the

Undersheriff, when questioned about what would happen if the [corrections officers] engaged in a work stoppage as part of a bargaining procedure, stated that the first effort of the County would be to reduce the number of inmates in the facility. This would be done by transporting prisoners to other facilities and getting court permission to release misdemeanor prisoners. The second effort on the part of the County would be to staff the jail, which he claims could be done by calling in the road patrol deputies. In this regard, the president of the [union] testified that he would advise the deputies not to do the [corrections officers'] work should the [corrections officers] be on strike. The record does not disclose whether or not the sworn deputies or road patrol deputies would disobey an order to man the jail. Another effort to man the jail would be to call in the 20 command officers. The undersheriff estimates there would be about 42 officers in a core group able to staff the jail.

The largest percentage of the County jail inmates, about 38 to 42 percent, are those convicted of misdemeanors whose offenses allow the Department to release them when the jail has become too crowded. The record also discloses that felony prisoners may be locked down in the maximum security block. This block could be supervised by experienced deputies called in from the road patrol. [*Washtenaw Co*, 1990 MERC Lab Op at 770.]

cases led to a finding that community safety would not be threatened as long as some set of circumstances existed under which the striking corrections officers could be replaced. *Id.* at 771. The panel stated:

In the [*Capitol City Lodge*] case, as here, the union argued that using road patrol deputies and other deputies would threaten the safety of the county residents by diminishing available personnel in other areas of law enforcement. The [*Capitol City Lodge*] Court specifically stated in this regard, "We agree with this Court's rejection of a similar argument in *Lincoln Park Detention Officers* v *City of Lincoln Park*, [76] Mich App 358, 256 NW2d 593 (1977).["] The [*Capitol City Lodge*] Court emphasized that reserves, as well as command officers and deputies, could take the place of striking [corrections officers]. The head of the Union in the instant case indicated he would recommend that the deputies not work in the jail and, therefore, the public and the prisoners would be endangered by a strike. This argument was considered in [*Mecosta Co*, 1989 MERC Lab Op at 612]. As in *Mecosta*, no evidence in this case indicates that deputies would disobey orders to fill in for striking [corrections officers]. In the *Mecosta* case, we stated as follows:

"In the case at hand, however, apparently in an effort to distinguish the [*Capitol City Lodge*] case, we have testimony of the president of the union that if the security officers struck, the road deputies would "honor" the strike, thus, the deputies would also engage in a strike, contrary to [the public employment relations act]. This, however, does not take the case beyond the consideration of the [*Capitol City Lodge*] case. The testimony of the sheriff was that he was available and the undersheriff was available, as well as the officer in charge of the jail, and a nonunion captain of the sheriff's department. This alone would take care of more than the three shifts requiring one man. If more than one person was necessary, the record establishes that the four part-time security officers would be available as non-union personnel. The record contains no evidence that

would justify the conclusion they would strike in support of
the security officers." [*Id.*, quoting *Mecosta Co*, 1989
MERC Lab Op at 612.]

Similarly, in *Kent Co*, another MERC panel determined
that although no formal plans were in place to replace
corrections officers in the event of a strike, testimony by
the sheriff and the undersheriff regarding emergency
matters that would be implemented if a strike occurred
was sufficient to establish that the corrections officers
could be replaced and, therefore, no threat to commu-
nity safety would occur. *Kent Co*, 1991 MERC Lab Op at
554-555; see also *Macomb Co Sheriff's Dep't v Michigan
Fraternal Order of Police*, 1991 MERC Lab Op 558
(finding that because corrections officer supervisors
could be replaced in the event of a strike, a threat to
community safety would not occur if they went on
strike and, therefore, they were not entitled to Act 312
arbitration).

In his concurring opinion in *Kent Co*, panel member
David S. Tanzman explained the changes that *Capitol
City Lodge* triggered concerning the manner in which
MERC panels determined whether a strike by correc-
tions officers would pose a threat to community safety,
as well as the policy changes that opinion implemented:

> I concur with my colleagues' conclusion that the correc-
> tions officers and radio technician in this case are not
> eligible to have their dispute with their employer arbi-
> trated under 1969 PA 312, but only because I believe
> *Capitol City Lodge* compels this conclusion.
>
> Under the [*Capitol City Lodge*] Court's interpretation of
> [*Metro Council No 23*], an employee who is not a certified
> police officer or firefighter must meet three tests before he
> can be found 312-eligible. First, his job must be subject to
> the hazards of police or firefighting work. We have repeat-
> edly held that correction officers or jail guards are subject
> to the hazards of police work, and no court has disagreed

with us on this point. *See, e.g. Washtenaw County Sheriff's Department*, 1979 MERC Lab Op 671; *County of Bay*, 1985 MERC Lab Op 377; *Local 214, Teamsters* v *City of Detroit*, 91 Mich App 273 [283 NW2d 722] (1979) [vacated 410 Mich 876 (1980)]. Secondly, the employee must be employed in a critical service department having as its principal function the promotion of the public safety, order, and welfare so that a work stoppage in that department would threaten community safety. The Kent County Sheriff Department is such a department. Moreover, were the Kent County jails to cease to function as a result of a work stoppage, a serious threat to community safety would arise. However, under [*Capitol City Lodge*], an employee must also meet a third test. That is, he must be an employee who could not be adequately replaced in the event of his striking.

I disagree with the [*Capitol City Lodge*] Court that an employee who performs a function critical to public safety is not covered by Act 312 if his employer asserts that his function could be performed by some other persons on a temporary basis in the event of a strike. I do not read this in [the *Metro Council No 23* Court's] holding that the prosecutor's investigators in that case were not covered by Act 312 because their department was not a critical service department in which a work stoppage could threaten community safety. I also note that many sworn police officers, a group clearly intended to be covered by Act 312, might not qualify under the [*Capitol City Lodge*] test because in the event of a strike their law enforcement functions might be assumed by the State Police or by neighboring police departments.

In addition, I also disagree with the [*Capitol City Lodge*] Court's analysis of whether the corrections officers in that case could be replaced in the event of a strike without a threat to community safety. In [*Capitol City Lodge*], the Employer described certain measures it would take to replace striking corrections officers. These measures included assigning road patrol deputies to the jail, hiring replacements, and transferring prisoners to other jails. The Court in [*Capitol City Lodge*] rejected the union's argument that moving road patrol deputies from their usual

duties to man the jail would result in a threat to community safety, citing the pre-[*Metro Council No 23*] decision in *Lincoln Park Detention Officers*. That decision noted that a [*sic*] work stoppages by almost any category of public employee, including street and highway personnel, could theoretically cause an extra burden on the police department. However, the [*Capitol City Lodge*] Court failed to note that in its case the number of correction officers exceeded the number of deputies with whom the Employer intended to replace them. Therefore, adequately manning the jail with deputies would require the Employer to essentially cease its law enforcement activities. The Court in [*Capitol City Lodge*] also failed to note that since the corrections officers and deputies were in the same bargaining unit, both groups would likely be on strike at the same time. Thirdly, the [*Capitol City Lodge*] Court did not question the Employer's assertion that it could operate its jail with untrained replacements without creating a risk to the public.

In the instant case, the sheriff and undersheriff testified that in the event of a strike by corrections officers they would utilize road patrol deputies and supervisory employees, hire replacements, extend shifts, transfer prisoners, and request assistance from the State Police to take over the law enforcement functions of its transferred deputies. I agree with my colleagues that there are no significant differences between the facts in [*Capitol City Lodge*] and those of the instant case. Therefore I reluctantly agree with their conclusion that the employees in this case are not eligible for arbitration under Act 312. [*Kent Co*, 1991 MERC Lab Op at 555-557 (citation omitted).]

In my opinion, the MERC has misinterpreted the extent of this Court's holding in *Capitol City Lodge*. The *Capitol City Lodge* Court acknowledged that the commission had not discussed whether a strike by jail security officers would threaten community safety, and it noted that the "record does not contain competent, material and substantial evidence that a strike by the Ingham County jail security officers would pose a threat

to community safety." *Capitol City Lodge*, 155 Mich App at 121. However, *Capitol City Lodge* does not stand for the proposition that employees are not eligible for Act 312 arbitration if they can be adequately replaced in the event of a strike.

In addition, *Capitol City Lodge* does not support the conclusion that corrections officers must meet the three-part test developed by MERC panels to be eligible for Act 312 arbitration. The MERC concluded that *Capitol City Lodge* compelled a determination that the employees in question must not be adequately replaceable in the event of a strike in order to establish that a strike by these employees would threaten community safety. See *Washtenaw Co*, 1990 MERC Lab Op at 771. However, this is only one factor that should be considered when determining whether a strike by corrections officers would threaten community safety. Rather, the MERC should employ a totality-of-the-circumstances test[8] and consider, among other things, the following additional factors: (1) the size and safety of the inmate population, (2) whether the transfer of inmates to another facility is feasible, (3) whether inmates would be released early in the event of a strike, (4) the effect that moving road patrol officers to the jail would have on public safety,[9] (5) the number of corrections officers needed to staff a jail in the event of a strike and whether it exceeds the number of police officers available, (6) whether police officers and corrections officers are on strike at the same time, (7) whether corrections officers could be replaced with untrained personnel, (8)

---

[8] Such a test requires the MERC panel to ask, Under the totality of the circumstances, does a strike by corrections officers threaten community safety?

[9] For example, transferring road patrol officers to act as corrections officers would leave a shortage of road patrol officers to contain threats and respond to emergencies in the community.

whether untrained replacements would create a risk to the public,[10] and (9) the effect that replacing union employees with unqualified, nonunion members would have on the morale and efficiency of the department. This is by no means an exhaustive list, and both the union and the employer are free to present additional factors at an evidentiary hearing. Nevertheless, this factors-based totality-of-the-circumstances approach is more sensitive to the highly factual nature of a determination whether a threat to community safety exists.[11]

---

[10] For example, in the rush to replace striking officers, one can envision a sheriff not having time to properly vet applicants and inadvertently hiring a relative or friend of a current inmate. An untrained guard or sympathetic friend or relative guarding a dangerous prisoner is a recipe for disaster and could threaten the safety of the community. Even with trained, professional security guards, jail escapes have occurred. The days of the Mayberry Police Department with Barney Fife guarding the jail have long since passed us by. If Deputy Fife were guarding the Oakland County jail, this certainly would pose a "threat" to community safety.

Similarly, we must remember that even experienced corrections officers face a certain amount of danger each day they report for work. Jails contain murderers, rapists, armed robbers, and other dangerous felons; they are not nice places. Corrections work is significantly more dangerous than being a security guard at your local seminary.

[11] I note that the scope of the phrase "pose a threat to community safety" does not mean that an occurrence is imminent. It is sufficient that a danger, risk, hazard, menace, or peril is created as a result of a strike. *Random House Webster's College Dictionary* (1997) defines "threat" in part as "an indication or warning of probable trouble." The fact that the threat can be avoided by other means does not mean that the threat does not exist; potential avoidance of the threat does not change the character of the evil or harm that may ensue.

I note that if "replaceability" were the only factor to be considered, then, hypothetically, even sworn police officers might not qualify for Act 312 arbitration because, in the event of a strike, their law enforcement functions could be assumed by the state police or by neighboring police departments. The phrase "threat to community safety" is broad in scope and does not contemplate an actual occurrence; it is sufficient if a danger,

I would vacate the decision of the MERC and remand this case for an evidentiary hearing. At the hearing, I would direct the MERC to decide, on the basis of the totality of circumstances, whether a strike by the union's members would threaten community safety. I note that "replaceability" of the employees is only one factor in the commission's decision. The main factor is whether a work stoppage would threaten community safety.

---

risk, hazard, or menace might occur as a result of a strike. Act 312 was passed so that employers would not be forced to take extraordinary measures in case of a work stoppage.